No. 94,333

In the Matter of BRET D. LANDRITH, *Respondent.*

(124 P.3d 467)

Opinion filed December 9, 2005.

*Stanton A. Hazlett,* disciplinary administrator, argued the cause and was on the brief for petitioner.

*Bret D. Landrith,* respondent, argued the cause and was on the brief pro se.

*David Martin Price,* of Topeka, was on an *amicus curiae* brief.

*Per Curiam:* This is an original contested proceeding in discipline filed by the Disciplinary Administrator against Respondent Bret D. Landrith of Topeka, an attorney admitted to the practice of law in Kansas in September 2002. The complaints arise out of Landrith's representation of two of his first four clients.

The hearing panel found that Respondent violated the following Kansas Rules of Professional Conduct (KRPC): KRPC 1.1 (competence) (2004 Kan. Ct. R. Annot. 342); KRPC 3.1 (meritorious claims) (2004 Kan. Ct. R. Annot. 438); KRPC 3.3(a)(1) (candor toward the tribunal) (2004 Kan. Ct. R. Annot. 444); KRPC 3.4(c) (fairness to opposing party and counsel) (2004 Kan. Ct. R. Annot. 449); KRPC 4.4 (respect for rights of third persons) (2004 Kan. Ct. R. Annot. 464); and KRPC 8.4(c), (d), and (g) (misconduct) (2004 Kan. Ct. R. Annot. 485).

This matter was heard by the duly appointed panel of the Kansas Board for Discipline of Attorneys on January 18, 19, and 20, 2005. The panel rendered a comprehensive 57-page report, making specific findings of fact and conclusions of law, and unanimously recommended disbarment.

Respondent argues to this court that the hearing panel's findings were not supported by clear and convincing evidence, that his actions were protected by the First Amendment, that the proceedings violated his due process rights, and that the proceedings were conducted in bad faith.

We have reviewed the record in this case, which contains the formal complaint, transcripts of the proceedings before the panel, and supporting material. The record also contains numerous pleadings and motions filed by the Respondent, as well as responses, replies, and orders related to the two cases. Respondent's language is occasionally incoherent, and, more than occasionally, inflammatory. In the pleadings and motions, Respondent consistently fails to cite a factual basis for his allegations or to develop sensible legal arguments.

We affirm the factual findings and conclusions of law of the panel, and we unanimously concur in its recommendation of disbarment.

## Factual Background

Respondent Landrith graduated from Washburn University School of Law in 2001. These proceedings arose out of his representation of David Price and James Bolden.

Respondent represented Price on appeal in what has been designated the "Baby C" case, which resulted in termination of Price's parental rights and a decree for adoption of Price's natural child.

Respondent represented Bolden in what has been designated the "Bolden Litigation": an appeal to the Court of Appeals and a lawsuit in federal court arising from a Shawnee County District Court condemnation case.

## The Baby C Case

A petition for the adoption of Baby C was filed on May 4, 2001, in the Shawnee County District Court. The petition included a consent by the birth mother and a home assessment prepared by a licensed agency in Colorado, where the proposed adoptive parents resided. The judge granted a temporary custody order to the adoptive parents the same day, pursuant to K.S.A. 59-2131. The adoptive parents were eventually approved under the Interstate Compact for Placement of Children (ICPC).

As required, a hearing was set for June 22, 2001, to among other things, terminate the parental rights of Baby C's father, Price. A return receipt showing delivery of notice of that hearing was signed

by Price. Price failed to respond or appear at the hearing, and the judge terminated his parental rights and granted the petition for adoption.

A few hours later, Price showed up at the judge's chambers, saying he had been unable to find the right courtroom for the hearing. An attorney was appointed for Price, and a motion to set aside the adoption and the order terminating Price's parental rights was filed without objection.

A second hearing was set for July 2002. After 2 days of testimony and 13 witnesses, the judge found that Price knew about the pregnancy of Baby's C's mother and failed to support her and that he knew about the birth of Baby C and failed to support and communicate with the baby. The judge concluded Price was unfit and terminated Price's parental rights. A notice of appeal was filed.

In late 2002, counsel for the adoptive parents, Topeka lawyer Austin Vincent, received an entry of appearance on behalf of Price from Respondent. Vincent contacted Respondent to ask if he needed any information or if he wished to discuss the case. Respondent told Vincent that he wanted nothing from him and that Respondent intended to sue Vincent for depriving Price of his civil rights under 42 U.S.C. § 1983 (2000).

Respondent and Price went to the Shawnee County court clerk's office several times, seeking records that they asserted were being withheld. In fact, nothing had been withheld from Respondent or Price, except the home study of the Department of Social and Rehabilitation Services, which was confidential and required a judge's signature to release. The home study was later provided to Respondent after he entered his appearance in the case.

Respondent's docketing statement, filed January 6, 2003, requested that

"the Court Clerk to wit; Kerri Orton, be named to produce any and all transcripts within this case. The Respondent has been denied access on several occasions, to obtain any information or specific documents. The Respondent also request [*sic*], that the Kansas Court of Appeals forward this matter for prosecution for interfering and impeding with due process within this case."

On January 13, 2003, Respondent filed a Motion to Compel asking the Court of Appeals to compel the Shawnee County Dis-

trict Court to produce "[a]ny and all records, filed in the Matter of Baby C." The motion contained a "Memorandum Is [*sic*] Support Of Motion to Compel" stating that "Appellant has reason to believe that crimes have been committed under the color of law, to wit; concealment, fraud, and conspiracy to kidnapping [*sic*]." This motion was denied on February 14, 2003, for lack of a factual basis.

On February 21, 2003, Respondent filed a Motion to Allow the Biological Father to Have Access to the Records, alleging that "[f]undamental prima facie error" existed as to the district court's determinations. The motion also contained allegations that Shawnee County District Court employees were obstructing justice; that Vincent had a conflict of interest; that the district judge "frustrated" Price's "effort to mitigate the damage done by ineffective [trial] counsel"; and that another judge, through his clerk, "continued to obstruct [Price's] constitutionally protected rights."

Judge G. Joseph Pierron of the Court of Appeals signed an order on March 3, 2003, allowing Price access to the district court's records as long as he was accompanied by counsel, who would be responsible for the security and the integrity of the records.

Respondent then filed a Motion for Appellate Court Order to Gain Access to Adoption Records, apparently seeking records he believed that the Shawnee County District Court was still withholding, and alleging alteration of documents, fraud, and circumvention of the ICPC by the adoptive parents.

The appellees filed two responses, denying all allegations. The appellees then filed a motion to clarify counsel of record, stating that Price had filed pro se pleadings before and that, although other pleadings filed by appellant appeared to be signed by appellant's counsel, they bore "a remarkable resemblance to the pro se pleadings previously filed." Respondent filed a response, affirming that he was counsel of record; Judge Lee Johnson denied the appellees' motion on March 10, 2003.

Respondent filed a Notice Transcripts Have Not Been Provided, seeking a transcript of the "custody hearings for Baby C taking place on 5/04/01 or earlier." Appellees filed a response stating that, to their knowledge, there were no judicial proceedings involving

Baby C before the filing of the original petition for adoption on May 4, 2001, and that no such transcripts existed. Appellees affirmed that transcripts for all proceedings on the record in the case had been included in the record for some time and requested a date certain for briefs.

On March 20, 2003, Judge Johnson ordered Respondent to be specific, pursuant to Supreme Court Rule 3.02(c) (2002 Kan. Ct. R. Annot. 20), in his request for transcripts, warning that failure to comply would result in dismissal of the appeal. Respondent filed yet another motion requesting transcripts and notices, which was not in compliance with the order, and which sought additions by the Shawnee County District Court. The Court of Appeals ignored the unimproved motion requesting nonexistent transcripts; stated that the request for additions was only properly brought in the district court; and ordered that briefs be filed by May 2, 2003. Respondent filed a Second Motion to Compel Shawnee County District Court Additions to Record.

Both parties filed briefs in the Court of Appeals.

Respondent also filed two habeas corpus motions in September 2003, while the appeal was pending in the Baby C case. Because the issues raised in each of the motions were identical to the issues on appeal and set for argument, the motions were denied.

In a December 19, 2003, opinion, the Court of Appeals affirmed the district court's termination of Price's parental rights. In conclusion, the court stated:

"[W]e are compelled to express consternation over most of the issues framed and argued by the appellant in this appeal. We generally conclude that, with the exception of a legitimate appeal from the termination of parental rights, [Price] and his counsel have asserted claims that have no factual or legal basis, often citing only conclusory and unsupported allegations of fact or without providing any supportive legal authority. We are inclined to admonish that vigorous advocacy certainly does not require or tolerate such conduct. We have diligently reviewed and addressed all claims asserted, but our objective discussion and determinations should not be viewed as condoning the assertion of such unsupported claims in our court." *In re Adoption of Baby C.*, No. 90,035, Slip op. at 20, unpublished opinion filed Dec. 19, 2003.

Throughout his representation in the Baby C case, Respondent filed numerous pleadings containing serious allegations of miscon-

duct by opposing counsel, members of the judiciary, Shawnee County District Court employees, and Kansas Court of Appeals staff.

While the litigation was still ongoing, an ethics complaint was filed against Respondent on May 9, 2003, by Jonathan Paretsky, Motions Attorney for the Kansas Court of Appeals. His complaint was joined by Judge Pierron, Judge David Knudson, and Judge Johnson. Both Paretsky and the district judge testified in the disciplinary proceeding, along with other judicial employees. The deposition of Jason Oldham, Chief Deputy Clerk for the Clerk of Appellate Courts, also appears in the record.

### Bolden Litigation

Respondent's representation of Bolden began in an appeal of a civil suit against the City of Topeka (City). Bolden had purchased two houses in a tax sale. One of the homes had already been ordered to be demolished by the city. Bolden challenged the demolition order, lost, and appealed to the Shawnee County District Court. Judge Eric Rosen directed a verdict in favor of the City, finding Bolden had failed to present evidence to overturn an earlier decision by an administrative hearing officer.

Before entering his appearance in the appeal of the case, Respondent attempted to obtain the record from the district court. Carol Barnes, Trial Court Clerk IV, testified that Respondent came in to check out the Bolden file in late December 2002. Because he was not an attorney of record, Barnes told Respondent he could view the file, but he could not remove it from the courthouse, pursuant to Supreme Court Rule 106 (2004 Kan. Ct. R. Annot. 162). Respondent admitted he had had trouble accessing the Shawnee County District Court's case file, that he contacted Judge Rosen, and that Judge Rosen gave Respondent permission to remove the record from the courthouse.

Respondent took the record the same day and returned it the next day. Several days later, he returned to the clerk's office, bringing documents he had not returned when initially bringing back the record. The file was checked, and it was determined that Exhibit J was missing. Barnes called Respondent about the missing

exhibit. Barnes testified that he was defensive, denied losing the exhibit, told her that he had "brought all the papers that had holes in them back," and hung up on her. In a subsequent conversation, he again became defensive, denied losing the exhibit, and hung up. At Judge Rosen's request, the record was then checked again, and it was determined that a total of five documents were missing. The clerk's office was able to create duplicates of the missing documents because they had been stored on microfilm.

Respondent has maintained that he returned the file in the best condition possible, although he has admitted he was guilty of failing to restaple some of the documents.

Respondent officially entered his appearance, appearing with Bolden at the Clerk of the Appellate Court's office to docket the appeal. Allison Schneider, docket clerk with the Court of Appeals, informed Respondent that he did not have the necessary paperwork to docket the appeal. Respondent became loud and angry. Schneider then asked Kathie Garman, her supervisor, to handle the situation. Respondent threatened to file a mandamus action if the appeal was not docketed. The documents were then filed even though they were deficient; Garman informed Respondent that a show cause order probably would be issued. Such an order was issued on April 1, 2003.

On March 17, 2003, Respondent sent a runner to the appellate clerk's office to file his brief in the Bolden Litigation. The brief recited numerous facts not in the record and facts not keyed to the record. Oldham later testified that he called Respondent to let him know the brief would be filed but that corrections would be necessary. Respondent demanded Oldham send him a notice of denial to file the brief. Oldham again told Respondent the brief would be filed; it merely needed to be corrected. Respondent again demanded a notice of denial and threatened to file a mandamus action to force the clerk's office to accept his brief as written.

The same day, Judge Johnson issued an order stating that Respondent's brief failed to comply with Supreme Court Rule 6.02(d) (2002 Kan. Ct. R. Annot. 34), requiring factual statements to be keyed to the record on appeal. Respondent's *Statement of Facts*

contained no reference to the record. Respondent was given 30 days to file a corrected brief.

On March 24, 2003, Respondent filed a Motion for Reconsideration of Order and Assignment of Costs. He asked the court to "rescind" its order and demanded that "the costs and attorney's fees resulting from the need to seek reconsideration of this order designated chargeable to the appellee, the City of Topeka as they are incurred as a result of the actions of the office of the Clerk of The Court of Appeals [*sic*]."

In this motion, Respondent also stated that he had "met great resistance to filing the docketing statement. The supervisor refused to accept the docketing statement" and "[c]ounsel [referring to himself] then informed the supervisor that the outcome of the Clerk of Appellate court in refusing to accept the docketing statement would not be an attempt to re-file it on another day but instead an action in mandamus seeking to have the clerk perform this duty," at which point the supervisor "acquiesced and accepted the docketing statement."

Respondent also stated that "[e]mployees of the Clerk of the Appellant Court objected to receipt of the brief because they stated in error that the brief did not contain a Statement of Facts" and "was not keyed to the record."

In a further "Memorandum of Law," Respondent stated that his allegations established "a pattern and practice indicative of training and management of Kansas Judicial Branch employees that emphasizes enforcing interests of an administrative or bureaucratic nature at the expense of injuring fundamental Due Process rights of Kansas citizens who are guaranteed a republican form of government." He further accused judicial branch employees of "demoralizing" him and his client by "consistently obstructing this appeal."

On April 11, 2003, Respondent filed a Motion for Clarification of Rulings in which he compared the Kansas appellate judiciary and its staff to those who had obstructed justice in the prosecution of civil rights murders in Mississippi.

He subsequently filed a Notice of Further Requirement to Amend Complaint, and finally, a Motion for Voluntary Withdraw

[*sic*] and Disclosure of Costs, stating that the "Clerk of the Appellate Court's bad faith prosecution of the appeal" forced Bolden to withdraw. He made the following accusations in this motion: that judicial branch employees continually obstructed justice; that Carol Green, Clerk of the Appellate Courts, justified denial of access to the public record; that Bolden's due process rights were violated "in this appeal by the agencies of the State of Kansas-Judicial Branch and the City of Topeka."

Respondent never filed a corrected brief and voluntarily dismissed the appeal on April 21, 2003.

Respondent also filed a complaint in the United States District Court for the District of Kansas on December 20, 2002. Its allegations arose from the condemnation as well as a janitorial contract Bolden had held with the City of Topeka, which the City had declined to renew. Three days later, Respondent filed a Request For Emergency Temporary Restraining Order Hearing, alleging corruption and discrimination by the City. The TRO request was denied because it set forth no factual basis.

On April 29, 2003, after the state court appeal had been dismissed, Respondent filed an Amended Complaint for Declaratory and Injunctive Relief in the federal district court. In that pleading, Respondent purported to add six defendants, including Meg Perry, a municipal employee, whom he accused of using "software created data to manufacture evidence that had the effect of taking away property from James L. Bolden."

When the City sought to dismiss the federal case, Respondent filed a late reply, alleging his failure to respond in a timely fashion was attributable to: (1) The necessity of filing an amicus brief on Bolden's behalf in another proceeding; and (2) the "appellate court motion panel filed a lengthy and vehement ethics complaint" against him.

The federal district court held a scheduling conference and issued a Scheduling Order on June 26, 2003. This order required all discovery to be completed by October 31, 2003.

Respondent filed a Second Amended Complaint in the federal suit on August 15, 2003. He alleged that the City refused to renew Bolden's janitorial contract in retaliation for his appeal of the con-

demnation and demolition of his houses. Respondent provided no factual support for this allegation.

Respondent then filed a Motion for Interim Attorney's Fees. The federal district court denied this motion on August 26, 2003. Respondent filed a Motion for a More Definite Ruling regarding this denial, stating that "the City of Topeka may not be aware that regardless of the resolution of the present case . . . the law of Kansas and the United States requires the City as a recipient of federal funding to repay Bolden for his attorney fees and court costs." No citations to supporting facts or law appeared in this motion.

The federal district court issued an order on October 14, 2003, denying the Motion for a More Definite Ruling and holding that the fees motion was completely without merit. The court also noted that the motions had not been filed correctly. Despite repeated attempts by the appellate clerk's office designed to encourage Respondent to withdraw and refile the motions, he had failed to do so.

On November 13, 2003, Respondent filed a motion to extend the discovery deadline to January 24, 2004. The discovery period had ended on October 31, pursuant to the earlier scheduling order. Respondent argued that "he had no reason to know before [November 13, 2003]" that an extension would be required. The court responded that it was "baffled by this statement." Respondent had responded to discovery propounded by the defense on October 24, and he had served his own discovery requests on October 30. The court found that Respondent had failed to comply with the federal rules of civil procedure, with local rules of the court, and with the scheduling order. The court also found inexcusable neglect and denied the motion to extend the discovery deadline.

Respondent did not seek to serve the six new defendants he had named in his Second Amended Complaint until November 19, 2003, 11 months after filing his original complaint, and 2 days before pretrial conference.

At the pretrial conference, United States Magistrate Judge James O'Hara considered whether the Second Amended Complaint should be dismissed because of Respondent's failure to ob-

tain proper service on the six new defendants. Respondent admitted that he did not know he had to serve the individual defendants at all, much less within the time limit set forth in Rule 4 of the Federal Rules of Civil Procedure. He argued that service was not necessary because: (1) Kansas statutes imputed knowledge of lawsuits against a municipality to all employees of the municipality; (2) the defendants had already entered an appearance; (3) the defendants had actual notice of the lawsuit.

Judge O'Hara, in his December 2, 2003, recommendation and report to Judge Kathryn Vratil, advocated dismissal of the Second Amended Complaint without prejudice. He stated that Respondent did not understand that the federal case was a wholly separate case and had not been "transferred" from state to federal court. Judge O'Hara further held that Respondent's ignorance did not amount to good cause for additional time to obtain service. Judge O'Hara further stated that Respondent failed to exercise "even a modicum of diligence" or to conduct "a scintilla of legal research with regard to the requirements of the Federal Rules of Civil Procedure." He continued:

"In closing, the undersigned wishes to express some words of caution to both plaintiff and Mr. Landrith. This case has been handled in an extremely haphazard manner. The court is mindful of and sympathetic to plaintiff's statement during the recent pretrial conference . . . that no attorney other than Mr. Landrith was willing to take plaintiff's case and that plaintiff is therefore thankful for Mr. Landrith's loyalty. But plaintiff would be prudent to bear in mind that loyalty and competence are different qualities. Stated more directly, the court is deeply troubled by Mr. Landrith's apparent incompetence. The pleadings he has filed [citations omitted], and his non-responsive, rambling, ill-formed legal arguments during the pretrial conference, suggest that he is not conversant with even the most basic aspects of the Federal Rules of Civil Procedure. The court doubts that Mr. Landrith has any better grasp of the substantive law that applies to this case.

"Based on what transpired at the pretrial conference, plaintiff appears more articulate that Mr. Landrith. Plaintiff may be better served by representing himself without any attorney if indeed Mr. Landrith is the only attorney willing to take the case."

In response to Judge O'Hara's recommendation, Respondent filed an Objection To Magistrate's Report and Recommendation that stated: "The plaintiff finds the report . . . a written manifes-

tation of the magistrate's continuing bias" and "Magistrate O'Hara has consistently dismissed material information on the law and facts relevant to this case, . . . has become embroiled in the controversy and he has demonstrated a disrespect for the plaintiff's counsel." Respondent also alleged that Judge O'Hara communicated an "utter disrespect toward plaintiff's counsel, repeatedly asking where he went to school, and forgetting the answer, asking if he had even had a class in civil procedure and asking if he had passed."

On February 2, 2004, Judge Vratil dismissed the six new defendants. She also dismissed that portion of the case arising from the condemnation because it had been litigated in state court.

The case went to trial only on the janitorial contract claim, with Bolden represented by Dennis Hawver. Respondent remained involved in the case, however, filing various motions, responses to objections, jury instructions, and, after the trial, a notice of appeal. As of this writing, the appeal was set for oral argument in the Tenth Circuit on November 17, 2005. Although Respondent was the attorney designated to appear at that oral argument, he had not filed the form required to confirm his anticipated appearance.

Sherri Price, Assistant City Attorney for the City of Topeka, filed the disciplinary complaint arising out of the Bolden Litigation on December 3, 2003. In response to Sherri Price's complaint, Respondent accused her of ethics violations and of taking "deliberate actions to deprive Mr. Bolden and myself of the resources to prosecute his case." He called Judge O'Hara's pretrial conference a "surprise" hearing. He accused Shawnee County District Attorney Robert Hecht's office of violations of the law and ethical misconduct, and accused Assistant U.S. Attorney David Plinsky of coaching defendants to deny valid service of process.

### Disciplinary Proceeding

The complaints from the Baby C case and the Bolden Litigation were consolidated, and a formal disciplinary complaint with two counts was filed on September 14, 2004.

Respondent reacted to the disciplinary complaints in two ways.

First, he filed suit in federal court, naming the following individuals as defendants: Stanton Hazlett, Disciplinary Administrator;

Judge Pierron; Judge Henry W. Green of the Court of Appeals; Judge Johnson; now Justice Marla Luckert; Judge Richard Anderson, now chief judge of the Shawnee County District Court; Paretsky; Sherri Price; and Brenden Long, Topeka City Attorney. This complaint was dismissed with prejudice on September 22, 2004, for lack of a legal basis.

Second, Respondent filed an 85-page document in this disciplinary proceeding, repeating accusations he had made in previous filings and adding new accusations. He accused now Justice Luckert and Judge Anderson of mismanaging funds; Justice Luckert of backdating an entry of appearance; the Shawnee County District Court staff of telling deliberate falsehoods; Chief Justice Kay McFarland and appellate clerk Green of obstructing justice and denying Price his constitutional rights; two other district judges of obstructing justice; Judge Pierron of deliberate and knowing falsehoods; and Vincent of altering records and other crimes, including operating "a baby export business." Additional accusations continued in this vein.

Respondent also stated that, having "since researched and investigated the matter further," he was "now certain" that Vincent, Wichita attorney Martin Bauer, attorney Alan Hazlett, and Stanton Hazlett, were engaged "in a common enterprise to kidnap Kansas babies through deception and coercion and sell the infants in an illicit commerce that is entirely dependent upon the participation of some officials in the Kansas Judicial Branch."

Respondent also made numerous accusations against specific named Topeka city officials and generally against the Topeka Police Department for harassing and stalking his clients and his witnesses. Both Price and Bolden, as well as several of Respondent's witnesses, presented affidavits attesting to the conspiracy involved in these cases and to the fact that Topeka police began harassing and stalking them once Respondent instituted the appeals for Price and Bolden.

Respondent also praised Shawnee County District Judge Terry Bullock's ethics course, which instilled in him "the ethical duty a Kansas attorney has to represent someone even if they [sic] are controversial." Respondent maintained that the only ethical viola-

tion of which he was guilty was his failure to mandatorily report the ethical violations of others. He argued that this failure was excused, however, because he was denied access to material evidence of unethical conduct by the court; therefore he was not required to make ethical complaints.

Respondent denied that he exhibited a lack of competence and argued that "[h]is conduct throughout the litigation was not prejudicial to the administration of justice and he continues to acquit himself as befits a first time attorney unexpectedly prosecuting a complex civil rights action."

Respondent requested that the ethics complaint be dismissed with prejudice.

Disciplinary Administrator Hazlett filed an amended complaint, clarifying two points Respondent had disputed. Respondent filed a response, which primarily alleged various instances of misconduct and crimes committed by the Disciplinary Administrator.

Respondent asserted that he would require 3 full days to present testimony from 40 individuals to the disciplinary panel. Among those named were the six complaining witnesses, *i.e.*, the three members of the Court of Appeals motions panel who had dealt with Respondent's behavior and pleadings in the Baby C case; Paretsky; Sherri Price; and Judge O'Hara. He also sought the testimony of six individuals involved in his cases, including three judges and three attorneys. He also sought the testimony of Chief Justice McFarland and Justice Luckert, as well as the testimony of 20 non-attorney witnesses. Respondent also requested "testimony of the [six] members of the common enterprise of adoption attorneys who obtained dismissals of ethics complaints against members of their associates by the adoption industry captured agency." He also sought to access the entire record of certain court cases.

Respondent's many motions, along with the Disciplinary Administrator's responses and Respondent's replies, were duly considered by the hearing panel, which issued a prehearing report. The panel provided for a 3-day hearing, with a fourth day left open if needed.

Throughout the hearing, the Disciplinary Administrator entered a number of relevance and competence objections. Respondent's

questions were often difficult to understand and appeared frequently to go to the merits of the Baby C case and the Bolden Litigation. Respondent was admonished by the panel to refrain from relitigating those matters.

Respondent also had served a subpoena to testify on Judge O'Hara. At the hearing, Respondent argued that the panel should refuse to admit certain witness testimony and exhibits because Judge O'Hara would not be appearing. Respondent said that Judge O'Hara was properly served but "has a very sophisticated legal argument — and he's represented by a U.S. Attorney — that because he's a federal officer, he doesn't have to appear before the state court."

The Disciplinary Administrator then presented a document faxed by Judge O'Hara, stating that the "Respondent has failed to comply with the judicial regulations of issuing a subpoena to a federal official," which required the subpoena to be requested 15 working days in advance. Despite this failure of compliance, Judge O'Hara did appear to testify.

During Respondent's testimony, when asked by the Disciplinary Administrator about Judge O'Hara's findings regarding his performance, Respondent stated, "I think that Magistrate O'Hara didn't show a — an understanding of Rule 4 and the state exception for effecting service of process. And in not understanding that, he alleges that I'm the one that's incompetent. I — I laid out my reasons why I disagreed with that." He also accused Judge O'Hara of ruling against Bolden because Bolden was black.

Judge O'Hara testified there were three grounds for his belief that Respondent's representation in the federal portion of the Bolden Litigation was incompetent: Respondent's pleadings were "rambling, disjointed and sloppy"; Respondent sought no discovery until it was too late for the discovery to be answered by the opposing side; and Respondent's conduct at the pretrial conference was "the worst performance I've seen by a lawyer in the 25 years since I've now been out of law school."

Judge O'Hara further testified that, if a pleading the quality of Respondent's pleading had been put on his desk "by an intern . . . [or] a first year law clerk while I was still in private prac-

tice, that intern and clerk probably would be summarily fired as opposed to worked with any further because the quality or lack of quality was so appalling that there was nothing salvageable." Judge O'Hara also flatly rejected the idea that there was any good faith basis for Respondent's Second Amended Complaint; he said that Respondent's argument that the six new defendants somehow waived service of process was frivolous.

Respondent testified in his own defense. He stated that the United States Constitution gave him immunity from liability for making the allegations he had made. He stated that Janice Lynn King, Price's secretary, typed and signed most, if not all, of the pleadings he had filed, although he was responsible for their content and was proud of them. He refused to agree that he had violated K.S.A. 60-211, which states that "[e]very pleading, motion and other paper provided for by this article of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name." Respondent further testified that he did not think he had violated the Kansas Rules of Professional Conduct in either the Baby C case or the Bolden Litigation but that he nevertheless expected to be disbarred.

Both Price and Bolden submitted affidavits attesting to their satisfaction with Respondent's representation and their gratefulness for his loyalty.

Price also filed an amicus curiae brief before this court to "preserve the truth, justice and set the record straight." In the brief, Price called the disciplinary complaint against Respondent "bogus" and part of continual harassment by the Disciplinary Administrator. He alleged that the State of Kansas and Kansas ethics boards were corrupt, have perjured testimony, have conspired to cover up crimes, and have violated laws. Price urged the Disciplinary Administrator to "dismiss all charges" as "Mr. Bret Landrith had clearly met his 51% of proof during the testimony."

Respondent also has cited the hardship he has incurred because of this disciplinary proceeding, including the loss of his house and wife and his inability to practice law. It is clear, however, that Respondent has continued to be involved in the practice of law. He has worked on a case in federal court in Kansas City, Kansas, in-

volving a medical supply company. He has represented a Missouri company on a contract claim arising in Kansas. He has represented himself in his divorce proceedings, apparently in three different courts. He also has filed a mandamus action against the appellate clerk.

Respondent also has remained involved in other activities. In particular, he has filed an antitrust complaint in federal court in the Western District of Missouri, although it is unclear whether he had the authority to do so. At the time of the panel hearing in December 2004, Respondent had not taken the Missouri bar examination.

The hearing panel made 99 findings of fact. The panel determined that Respondent violated the following sections of the Kansas Rules of Professional Conduct in connection with his representation of Price and of Bolden:

KRPC 1.1 (2004 Kan. Ct. R. Annot. 342) — Competence — Repeated violations in connection with his representation of Price in the Bolden Litigation.

KRPC 3.1 (2004 Kan. Ct. R. Annot. 438) — Meritorious Claims and Contentions — Repeated violations through assertions that he had properly served defendants in the Bolden Litigation.

KRPC 3.3(a)(1) (2004 Kan. Ct. R. Annot. 444) — Candor Toward the Tribunal — "systematically violated" KRPC 3.3(a)(1).

KRPC 3.4(c) (2004 Kan. Ct. R. Annot. 449) — Fairness to Opposing Party and Counsel — violations by knowingly and intentionally disobeying rules of the tribunal, including failing to follow the Supreme Court rules for appellate practice.

KRPC 4.4 (2004 Kan. Ct. R. Annot. 464) — Respect for Rights of Third Persons — Numerous violations by repeated accusations against the judiciary, attorneys, and court personnel of wrongdoing.

KRPC 8.4(c), (d), and (g) (2004 Kan. Ct. R. Annot. 485) — Misconduct — Numerous violations through false accusations against others and failure to comply with Supreme Court rules for appellate practice.

In recommending disbarment, the panel noted Respondent's "total incompetence in the practice of law" and concluded that he was "not equipped with the ethical or intellectual characteristics

necessary to ever become an active and productive member of the bar of the state of Kansas." The panel found that Respondent felt his law license granted him the ability to allege whatever he wanted against whatever person or entity, regardless of whether the allegations were true or false. The panel further found that Respondent was "either unwilling or unable to understand basic principles in the practice of law"; that he would be a detriment to future clients, the public, the legal profession, and the legal system; and that his performance as a lawyer and his allegations of misconduct on the part of others were reprehensible.

## Analysis

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of the KRPC exist and, if so, what discipline should be imposed. *In re Berg*, 264 Kan. 254, 269, 955 P.2d 1240 (1998). Attorney misconduct must be established by substantial, clear, convincing, and satisfactory evidence. *In re Lober*, 276 Kan. 633, 636, 78 P.3d 442 (2003); see also Supreme Court Rule 211(f) (2004 Kan. Ct. R. Annot. 275) (misconduct to be established by clear and convincing evidence).

### Factual Findings

Respondent challenges the panel's finding that faults him for seeking nonexistent adoption hearing records and argues Hazlett sought to "fraudulently obtain a finding of probable cause against the respondent."

Respondent also argues that the panel "fraudulently asserted that the respondent failed to adequately cite to the record in [Price's] appeal brief." He asserts the brief made 67 citations to the record to support Price's contentions and curiously contends the supported points were the same points as those for which the panel charged him with untruthfulness.

Respondent also again alleges that an adoption conspiracy caused the hearing panel to find against him.

Respondent also faults the panel for relying heavily on Judge O'Hara's recommendation and report, which he again alleges was based on "profound bias" because Judge O'Hara once was man-

aging partner in a firm now opposing Respondent in a pending Missouri case.

Concerning the panel's finding that he breached an ethical duty of competence in failing to serve the six new defendants in the Bolden case, Respondent says he "does not believe it to be a violation."

He maintained these positions in front of this court and continued to argue that he was being prosecuted for representing minorities, and that the hearing panel, the Disciplinary Administrator, the judiciary and judicial employees and others were biased against him based on his representation of such minorities. He maintained that he had done nothing wrong.

Each of the panel's 99 findings is well supported by the record. The factual findings of the panel were identical in substance to the facts set out above, and these facts were drawn from the record created in these proceedings. Respondent's argument to the contrary is completely without merit. Respondent failed during the panel hearing to present even an iota of factual support for his positions, instead continuing to rely on unsupported allegations. The panel's findings of facts are affirmed by this court, and we find that there was clear and convincing evidence of each of the violations.

*Legal Arguments*

*A. Invocation of First Amendment Protection*

Respondent asserts that this proceeding somehow violates his First Amendment rights. He cites no fact or law to support this contention, except his allegation that the underlying ethical complaints made him unable to accept work representing other clients.

Respondent's brief contains no coherent argument as to how his First Amendment rights were violated. His discussion on this issue centers on an alleged conflict of interest of Hazlett and the Disciplinary Administrator's office, as well as accusations against Judge Pierron, Paretsky, and Oldham.

Respondent does cite to a Tenth Circuit case for the proposition that "[i]t is public policy . . . everywhere to encourage the disclosure of criminal activity," *Lachman v. Sperry-Sun Well Survey-*

*ing Co.*, 457 F.2d 850, 853 (10th Cir. 1972); and he further states that the "public policy interest is clearly in the respondent representing James Bolden and David Price lawfully to accomplish their goals."

The Disciplinary Administrator suggests that Respondent intends to argue that he has a right to make the accusations contained in his pleadings against members of the judiciary, judicial staff members, opposing counsel, city officials, and others and that this right is guaranteed by the First Amendment. During the hearing, Respondent testified that he believed the First Amendment gave him immunity to make the claims he had made.

*In re Johnson*, 240 Kan. 334, 729 P.2d 1175 (1986), was a contested case in which this court found a respondent should be disciplined for false, unsupported criticisms of and misleading statements about his opponent in a county attorney election campaign. In our discussion of the First Amendment in relation to attorney speech, we said:

"A lawyer, as a citizen, has a right to criticize a judge or other adjudicatory officer publicly. To exercise this right, the lawyer must be certain of the merit of the complaint, use appropriate language, and avoid petty criticisms. Unrestrained and intemperate statements against a judge or adjudicatory officer lessen public confidence in our legal system. Criticisms motivated by reasons other than a desire to improve the legal system are not justified." *Johnson*, 240 Kan. at 336.

Likewise, in *State v. Russell*, 227 Kan. 897, 610 P.2d 1122, *cert. denied* 449 U.S. 983 (1980), a respondent made false statements while running for a position on the Board of Public Utilities, and the comments were not deemed to be protected speech.

"Upon admission to the bar of this state, attorneys assume certain duties as officers of the court. Among the duties imposed upon attorneys is the duty to maintain the respect due to the courts of justice and to judicial officers. A lawyer is bound by the Code of Professional Responsibility in every capacity in which the lawyer acts, whether he is acting as an attorney or not, and is subject to discipline even when involved in nonlegal matters, including campaigns for nonjudicial public office. *State v. Russell*, 227 Kan. 897, 610 P.2d 1122, *cert. denied* 449 U.S. 983 (1980)." *State v. Johnson*, 240 Kan. at 337.

The case at bar does not involve an attorney acting in nonlegal matters. It involves the conduct of an attorney acting in his pro-

fessional capacity. In either situation, when a lawyer's unbridled speech amounts to misconduct that threatens a significant state interest, it is clear that a State may restrict the lawyer's exercise of personal rights guaranteed by the Constitutions. See *N.A.A.C.P. v. Button*, 371 U.S. 415, 438, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963).

Respondent has made and continues to make serious accusations against members of the judiciary, court staff, attorneys, municipal officers and employees, and others. The panel found that he failed to provide even "one scintilla of proof of such wrongdoing, through exhibits, witnesses, or his own testimony." The panel further found that "[i]t is patently obvious that the Respondent either failed to conduct any investigation whatsoever into the claims made by his client or that he personally invented the serious allegations of wrongdoing."

Moreover, the panel found that Respondent had based many of these allegations on information provided to him by his client, Price. At the hearing, the presiding officer asked whether, after the passage of a couple of years, Respondent now believed that some of these statements were untrue. Respondent replied "No, sir, I don't know of anything that is not true." Rather, he went on to reaffirm the accusations against the court employees, Judge Pierron, Vincent, and others. When asked about his allegation that now Justice Luckert backdated an entry of appearance in a previous case involving Price, Respondent admitted he was uncertain whether such an entry of appearance even existed.

The First Amendment provides no defense for the inflammatory and false accusations that Respondent has repeatedly made in his pleadings and motions, and which he maintained orally in the panel hearing and in oral argument before this court.

### B. Invocation of Due Process

Respondent argues eight violations of due process, asserting he was: (1) prevented from presenting a record; (2) barred from raising constitutional claims; (3) subjected to cumulative prosecutorial misconduct; (4) subjected to "bad faith participation in [an] unlawful motive"; (5) denied access to exculpatory evidence; (6) sub-

jected to retaliation against his witnesses; (7) victimized by racial discrimination; and (8) selectively prosecuted.

In reviewing a procedural due process claim the court must first determine whether a protected liberty or property interest is involved and, if so, the court must then determine the nature and extent of the process due. *Winston v. Kansas Dept. of SRS,* 274 Kan. 396, 409, 49 P.3d 1274 (2002).

A due process violation can be established only if a claimant is able to establish that he or she was denied a specific procedural protection to which he or she was entitled. The question of the procedural protection that must accompany a deprivation of a particular property right or liberty interest is resolved by a balancing test, weighing (1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the State's interest in the procedures used, including the fiscal and administrative burdens that the additional or substitute procedures would entail. *Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976).

The question of what process is due in a given case is a question of law over which an appellate court has unlimited review. *State v. Wilkinson,* 269 Kan. 603, 608-09, 9 P.3d 1 (2000).

The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Winston,* 274 Kan. at 409.

The United States Supreme Court has held that the Due Process Clause applies to lawyer disciplinary proceedings. That due process includes fair notice of the charges sufficient to inform and provide a meaningful opportunity for explanation and defense. *In re Ruffalo,* 390 U.S. 544, 20 L. Ed. 2d 117, 88 S. Ct. 1222, *reh. denied* 391 U.S. 961 (1968). Kansas has specifically adopted this holding. *State v. Caenen,* 235 Kan. 451, 458-59, 681 P.2d 639 (1984); see *In re Daugherty,* 277 Kan. 257, 261, 83 P.3d 789 (2004).

To the extent that the substance of Respondent's arguments can be discerned, there is nothing in his brief or in his oral argument before this court that indicates his arguments regarding due pro-

cess violations have any basis in fact. However, we briefly address each of his arguments below.

### 1. Prevented From Presenting A Record

Respondent argues that he was "prevented from presenting the record related to the charges against him" and that "[w]itnesses were prevented from making reference to documents answering the arguments of Stanton Hazlett's case on the tribunal's constantly repeated admonishments of the respondent not to question witnesses on issues that turned out to be the tribunal's report recommendation for disbarment."

Neither Respondent's brief nor his oral argument have indicated which specific relevant records he was prevented from producing or exactly which issues or documents witnesses were "admonished" not to speak of. He may be referring to the panel's admonishment that he not attempt to relitigate the Baby C or Bolden claims. This was not a violation of due process, and this argument lacks merit.

### 2. Barred from Raising Constitutional Claims

Respondent argues he was barred from raising "selective prosecution" as a constitutional claim during the hearings. However, in no instance was Respondent barred from raising this or any constitutional claim. He did in fact raise constitutional claims in the proceeding before the panel and before this court.

For example, he testified that the ethics violations he was charged with, arising from his accusations of criminal activity against various persons, infringed protected speech. He further testified that he was upholding the Constitution by his actions. He was not barred from so testifying at the disciplinary hearing, and he raised the claims again in his brief to this court and his argument before us. This argument lacks merit.

### 3. Subjected to Cumulative Prosecutorial Misconduct

In support of this contention, Respondent references only the "prosecutorial misconduct, discussed above."

This court's recent decision in State v. Tosh, 278 Kan. 83, 91 P.3d 1204 (2004), provides a two-step analysis under which we analyze allegations of prosecutorial misconduct in criminal cases.

This court need not reach the *Tosh* analysis here, however, because Respondent fails to complain of any specific instance of conduct, accusing the Disciplinary Administrator only of general "vindictiveness." In truth, in view of Respondent's many wild unsupported allegations, in appears to us the Disciplinary Administrator has been extremely patient and professional throughout these proceedings. Respondent's argument on this point is incoherent and lacks merit.

### 4. *Subjected to "Bad Faith Participation in Unlawful Motive"*

This argument appears to refer again to Respondent's unsupported allegations against the Disciplinary Administrator, who, he states, is embroiled with other state and judicial employees in a "common enterprise to kidnap Kansas babies through deception and coercion and sell the infants in an illicit commerce." He also argues that Judge Pierron, who joined in Paretsky's initial complaint regarding the Baby C case, "had an undisclosed fiduciary interest that was directly affected financially by the resolution of the issues." These allegations are completely without factual basis, and the tandem argument is without merit.

### 5. *Denied Access to Exculpatory Evidence*

Respondent argues that "material affidavits and other exculpatory evidence contained as attachments from both complainants" were omitted from "the first and second *ex parte* probable cause hearings." Respondent does not indicate what exculpatory evidence might exist or have been withheld.

### 6. *Subjected to Retaliation Against His Witnesses*

Respondent alleges specific instances in which witnesses he named to support him in this proceeding were retaliated against.

Respondent states that a few days after he named Frank Williams as a witness in support of "Stan Hazlett's pattern and practice," the State "sought to seize [Mr. Williams'] stock" in satisfaction of "a long dormant judgment." Respondent also argues that "[s]everal natural parents" were prepared to testify against a number of attorneys involved in the alleged adoption/kidnapping con-

spiracy, but that the Disciplinary Administrator dismissed the complaints against the attorneys.

At Respondent's request, the panel reviewed confidential records of possible disciplinary complaints against four attorneys representing adoptive parents in camera. The panel concluded that any complaints that existed were not relevant and that they would fail to establish a connection between those attorneys' treatment by the Disciplinary Administrator's office and any alleged conspiracy.

Respondent also pointed to several affidavits alleging retaliation by Topeka city officials and Topeka police. The record is otherwise totally devoid of facts to support the argument that Respondent's due process rights were violated by retaliatory actions taken against his witnesses. The affidavits were submitted in connection with the Bolden Litigation. No connection is established between those affidavits and Respondent's due process rights in this hearing.

### 7. Victimized by Racial Discrimination

Respondent also argues the Equal Protection Clause precludes selective enforcement of the law based on race or ethnicity. He argues that he presented witnesses who testified that the proceedings were "deliberately based on an arbitrary, illegal, or otherwise unjustifiable standards [sic]." Presumably Respondent is referring to his own testimony alleging that the basis for Judge O'Hara's ruling was Price's race, and to the testimony of Price, whose ideas largely formed Respondent's allegations.

Judge O'Hara strenuously denied this charge of racial discrimination.

Respondent also alleges that Paretsky singled his motions out because he was representing an African-American and further alleges that racial discrimination was the initial motivation for the disciplinary action against him. Paretsky categorically denied these allegations in his reply and again in his testimony at the disciplinary hearing; he singled out the motions because they resembled pro se complaints, and he was concerned the client might be injured by the representation.

Respondent further alleges that he "was charged for representing an African-American and an American Indian who were at all times treated differently than litigants who were members of a majority race." Several witnesses, including Oldham, Paretsky, and Barnes, testified that the plaintiffs in Respondent's cases were treated no differently than other litigants.

Respondent makes several other accusations that are unsupported by the record. At oral argument before this court he persevered in his allegations against Judge O'Hara, Paretsky, and others with no apparent ability or willingness to support those allegations with facts. In essence, he evidently resorted to such allegations whenever challenged. His beliefs—or, more likely, excuses for the bad outcomes flowing from his incompetent legal work—do not support his racial discrimination argument.

### 8. Selectively Prosecuted

Respondent argues that the Disciplinary Administrator and the panel "recognized a substantial basis existed to find that the respondent was selectively prosecuted so they denied the respondent his Sixth Amendment right to call witnesses and put on evidence of Selective Prosecution."

Respondent seems to base this argument on the fact that Stanton Hazlett did not testify at the panel hearing. Stanton Hazlett was named on Respondent's list of witnesses; it is unclear whether Respondent ever sought to have him testify beyond that. Stanton Hazlett acted as the prosecutor in these proceedings.

Respondent's argument of selective prosecution is without merit.

### General Due Process Analysis

Having examined and rejected Respondent's multiple specific due process arguments, we pause finally to note that there is absolutely no other basis for any argument that a due process violation existed in this case.

Kansas Supreme Court Rule 211(b) (2004 Kan. Ct. R. Annot. 275) requires the formal complaint in a disciplinary proceeding to be sufficiently clear and specific to inform the respondent of the

alleged misconduct. The complaint in this case was sufficiently clear.

In all other respects, Respondent was provided abundant due process of law in these proceedings. Respondent's many motions, along with the Disciplinary Administrator's responses and Respondent's replies, were duly considered by the hearing panel, which issued a prehearing report, ruling on each issue and addressing any due process concerns. The panel also provided for a 3-day hearing, as Respondent desired, with a fourth day left open if needed.

The Disciplinary Administrator objected to only two of the forty individuals Respondent sought to have testify. These two, Chief Justice McFarland and Justice Luckert, did not have any information relevant to the charges against Respondent. The panel also went through the witness list with both Respondent and the Disciplinary Administrator. Its refusal to allow a number of suggested witnesses because they had no information, or had only irrelevant information, was sound. The panel specifically allowed Respondent to call 18 of his initial 40 witnesses, and stated it would allow testimony of the others if there was a showing that they had relevant testimony to offer. The fact that certain witnesses never testified was due to Respondent's failure to ensure their appearance or to his voluntary decision not to call them.

Regarding Respondent's request to subpoena records and witnesses, the panel referred Respondent to Supreme Court Rule 216 (2004 Kan. Ct. R. Annot. 293) and to K.S.A. 60-245 and informed him that, while he could use whatever authority those statutes provided him, neither the panel nor the Disciplinary Administrator's office would issue subpoenas on his behalf. The Disciplinary Administrator objected to the introduction of records on the basis that they contained confidential information pursuant to Supreme Court Rule 222 (2004 Kan. Ct. R. Annot. 322) and were not relevant to the charges against Respondent. The panel noted that it was not passing on the admissibility of the records or witnesses within the prehearing order.

The panel denied Respondent's motion to dismiss based on hardship from delay, finding that the hardship, if any, was the result of Respondent's voluntary decision not to accept legal work. The

panel recognized that Respondent had been informed and clearly understood that he was under no obligation to refrain from practicing law during the pendency of this proceeding. Moreover, much of the delay was due to the extensive number of prehearing motions filed by Respondent, which the hearing panel reviewed and to which it responded.

The panel also denied Respondent's motion to dismiss based on alleged bad faith prosecution and the Disciplinary Administrator's alleged conflict of interest. After reviewing the motion, the Disciplinary Administrator's response, and Respondent's reply, the panel heard argument at a prehearing conference. It attributed the conflict of interest allegation to Respondent's unsupported belief that the Disciplinary Administrator was and is part of a conspiracy regarding adoption cases in Kansas.

Respondent was also allowed an in camera review of possible disciplinary complaints against four attorneys representing adoptive parents, in order to evaluate his allegation of bias. The panel concluded that any complaints were not relevant and would fail to establish a connection between the lawyers' treatment by the Disciplinary Administrator's office and the alleged conspiracy.

In summary, Respondent received all the process he was due and more. He had notice of the proceedings; he had an opportunity to be heard, to present testimony, to confront and cross-examine witnesses; he had a right to counsel if he so desired. There was no violation of due process in this proceeding.

### C.  Was Respondent Prosecuted in Bad Faith?

Respondent also alleges that the Disciplinary Administrator and the disciplinary committee instituted these proceedings in bad faith. He argues that no action should be taken against him because "there is substantial evidence of prosecutorial misconduct requiring the conclusion that these charges were brought in bad faith."

In support of this allegation, Respondent appears to rely on his answer to the first ethics complaint, in which he argued that he had "civil probable cause" under *Bergstrom v. Noah*, 266 Kan 829, 974 P.2d 520 (1999); and that the court had been "deceived

through fraud, which has the effect of voiding an adoption. To prove this, I needed the records or to determine they did not exist."

In *Bergstrom*, this court held that attorneys had probable cause to bring an action under Kansas antitrust statutes and could not be held liable for malicious prosecution. That case cited *Nelson v. Miller*, 227 Kan. 271, 276, 607 P.2d 438 (1980), for the proposition that,

" '[t]o maintain an action for malicious prosecution of a civil action the plaintiff must prove the following elements:

(a) That the defendant initiated, continued, or procured civil procedures against the plaintiff.

(b) That the defendant in so doing acted without probable cause.

(c) That the defendant acted with malice, that is he acted primarily for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based.

(d) That the proceeding terminated in favor of the plaintiff.

(e) That the plaintiff sustained damages.' " *Bergstrom v. Noah*, 266 Kan. 829, 836-37, 974 P.2d 520 (1999).

Respondent fails to allege or prove a single one of the elements necessary to establish a malicious prosecution claim, and, but for his cite to *Bergstrom*, his argument also is completely unsupported by legal citation. Thus this argument also is rejected.

We adopt the findings of fact and conclusions of law made by the hearing panel. We hold that Respondent has violated the following rules: KRPC 1.1 relating to competence; KRPC 3.1 relating to meritorious claims; KRPC 3.3(a)(1), relating to candor toward the tribunal; KRPC 3.4(c) relating to fairness to opposing party and counsel; KRPC 4.4, relating to respect for rights of third persons; and KRPC 8.4(c), (d), and (g), misconduct.

We also have considered the hearing panel's analysis of the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (Standards): (1) the duty violated; (2) the lawyer's mental state; (3) the potential or actual injury caused by the misconduct; (4) and the existence of aggravating or mitigating factors.

Respondent violated his duty to his clients to provide competent representation. He violated his duty to refrain from interfering with the administration of justice. He violated his duty to the legal pro-

fession to maintain personal integrity. He violated these duties intentionally. As a result of his misconduct, Respondent caused actual injury to the adoptive parents of Baby C; to Vincent, their counsel; and to the legal system and the legal profession. Respondent's behavior cost Baby C's adoptive parents more than $20,000. Vincent forgave the parents an additional $10,000 in attorney fees. In addition, the personal anxiety and stress experienced by the adoptive parents in their experience with the legal system was dramatically increased due to Respondent's conduct.

Furthermore, the legal system itself suffered injury as a result of Respondent's misconduct. The Kansas Court of Appeals and the United States District Court for the District of Kansas wasted valuable resources because of Respondent's absolute incompetence and interference with the administration of justice. Finally, the legal profession has been damaged by Respondent's false accusations against members of the judiciary; attorneys; court personnel; and other state, county, and municipal employees.

We also adopt the hearing panel's findings regarding the following aggravating factors: pattern of misconduct; multiple violations; lack of acknowledgment of wrongdoing or remorse. Even at oral argument, Respondent refused to acknowledge the wrongfulness of his conduct.

This court also adopts the panel's findings regarding certain mitigating factors in this case: Respondent has no previous disciplinary record. Further, although Respondent repeatedly engaged in reprehensible conduct, it does not appear that he was motivated by dishonesty or selfishness. The panel acknowledged that at the time Respondent first engaged in misconduct, he had only been practicing law for 4 months. He was certainly inexperienced. However, Respondent persisted in his misbehavior up to the date of his oral argument before this court. Whether this is due to ignorance or stubbornness, the public must be protected from his further practice.

As noted above, the panel recommended disbarment. Respondent seeks dismissal of this action.

Disbarment is generally appropriate when a lawyer's course of conduct demonstrates that he or she does not understand the most

fundamental legal doctrines or procedures, and the lawyer's conduct causes injury or potential injury to a client. ABA Standard 4.51. Furthermore, disbarment is generally appropriate when a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on his or her fitness to practice. ABA Standard 5.11.

We have performed the exhaustive review of the record urged by Respondent at oral argument. It provides a wealth of evidence supporting the panel's recommendation and none supporting Respondent's plea for dismissal. We therefore unanimously adopt the hearing panel's recommendation of disbarment.

IT IS THEREFORE ORDERED that Respondent Bret D. Landrith be and he is hereby disbarred from the practice of law in the state of Kansas, that his privilege to practice law in the state of Kansas is revoked, and that the Clerk of the Appellate Courts of Kansas strike the name of Bret D. Landrith from the roll of attorneys licensed to practice in the state of Kansas.

IT IS FURTHER ORDERED that this opinion shall be published in the official Kansas Reports, that the costs herein be assessed to the respondent, and that respondent forthwith comply with Supreme Court Rule 218 (2004 Kan. Ct. P. Annot. 301).

MCFARLAND, C.J., and LUCKERT, J., not participating.

LOCKETT, J., Retired, LARSON, S.J., and BUSER, J., assigned.