No. 96,579

In the Matter of E. THOMAS PYLE, III, *Respondent*.

(156 P.3d 1231)

Opinion filed April 27, 2007.

*Alexander M. Walczak,* deputy disciplinary administrator, argued the cause and was on the brief for petitioner.

*Mark G. Ayesh,* of Ayesh Law Offices, of Wichita, argued the cause, and *Ray E. Simmons,* of the same firm, was with him on the briefs for respondent.

*Per Curiam:* This contested disciplinary matter arises as a result of respondent E. Thomas Pyle's reaction to his published censure in an earlier disciplinary case, *In re Pyle,* 278 Kan. 230, 91 P.3d 1222 (2004) (*Pyle I*).

On July 12 and 13, 2004, after this court issued its opinion in *Pyle I*, the *Hutchinson News* and the *McPherson Sentinel* and *Sentinel* ran articles discussing the respondent's censure. On July 14, 2004, the respondent sent a lengthy letter to more than 281 friends, clients, and family members. The first section of the letter read in pertinent part:

"The purpose of this letter is to provide you with some insight in response to a decision by the Kansas disciplinary administrator and Kansas supreme court. The decision stems from an incident that I had with another lawyer while working on a personal injury case.

"I represented a young lady who was injured at the home of a young gentleman. We tried to resolve the matter with his insurance company, but they refused to settle the case despite the fact that the gentleman took responsibility for the accident and admitted liability. In fact, the gentleman provided me with an affidavit before an attorney was hired. . . .

. . . .

"Despite this affidavit, American Family hired an attorney to defend the gentleman ('defendant'). The defendant showed the affidavit to his attorney and the insurance company.

"After meeting with his attorney, the defendant and my client ('the plaintiff') had several conversations. The defendant's attorney told the defendant that the plaintiff was 100% at fault for the accident and that he (the attorney) was going to deny all liability. The defendant's attorney told the defendant that he represented the insurance company and not the defendant. The defendant's attorney

told the defendant that he denied liability in 100% of the cases he defends regardless of the facts of the case. He also told him several other disturbing things. This is despite the fact that the defendant admitted liability and fault. All of this is in the record.

"After my client learned of this from the defendant, she called me and asked me what she could do. The defendant was very upset with 'his' attorney and told the plaintiff several other things. The plaintiff told these things to me and asked if I could prepare an affidavit for the defendant to sign. I told her that I could, but that I could not communicate directly with the defendant because he was represented by an attorney. At my client's request, I prepared [an] affidavit.

. . . .

"This information came directly from the plaintiff to me. I mailed this affidavit to my client and she discussed with the defendant. At no time did I ever communicate with the defendant. That would be unethical and in violation of Kansas Rule of Professional Conduct, Rule 4.2, . . . .

. . . .

"The comment to this rule reads in part — parties to a matter may communicate directly [sic] each other. The parties in our case would be the plaintiff and the defendant.

"I specifically told my client that I could not communicate with the defendant, but that she was free to communicate directly with him. She did and the defendant voluntarily signed the second affidavit. The plaintiff mailed the affidavit to me and I sent a letter to the defendant's attorney.

. . . .

"After receiving this letter, the defendant's attorney filed a complaint against me with the Kansas Disciplinary Administrator's office. I in turn filed a complaint against him with the same office. This attorney then withdrew from the representation of the defendant in the Court case.

"The attorney I filed a complaint against is a member of the Kansas Board of Discipline of Attorneys — the same board that reviews complaints against attorneys and the determines whether an attorney has violated a rule of professional conduct.

"[Footnote: Kansas is different than a lot of states. In Kansas, attorneys judge the conduct of other attorneys. If someone feels that an attorney has engaged in unethical conduct, a complaint is filed with the Kansas Board of Disciplinary Administrator [sic]. There is an investigation by attorneys and then a hearing may be necessary. In other states, attorneys are afforded a real trial in front of a jury instead of an administrative hearing in front of other attorneys.]

"In other words, I filed a complaint against one of their own and one of their own filed a complaint against me.

"The defendant's attorney has been a member of this board for several years. My research shows that a large number of this board is filled by attorneys who work for law firms that defend insurance companies and their insureds. In fact,

the three member panel that heard the complaint against me consisted of two members who work for law firms that defend insurance companies.

"The complaint against me was filed almost three years ago and the hearing on the complaint against me was over a year ago. To my knowledge there has been no hearing on the complaint I filed against the defendant's attorney. In fact, my panel made the statement that the defendant's attorney did nothing wrong. You can make your own conclusions — was it fair for the defendant's attorney to ignore the defendant's admissions, take opposite positions from the defendant, threaten the defendant, and intimidate the defendant?

"The panel found that I violated Rule 4.2 by communicating with a party that is represented by an attorney — they said I violated this by using my client to communicate with the defendant. They relied on a former version of the rule which prevented a lawyer from 'causing another to communicate' with a party represented by an attorney. This phrase 'causing another to communicate' was removed from the current version of the rule and the current version of the rule specifically allows for parties to communicate with one another. Even though the old rule does not apply to my case, the panel somehow found that it did apply? [*sic*] It did not make sense to me then and it does not make sense to me now.

"The panel also found that I violated Rule 8.3(a) for not reporting misconduct on the part of defendant's attorney. My response was that I did report the misconduct.

"The panel also found that I violated Rule 8.4(g) when I wrote my letter to the defendant's attorney. I acknowledged that my letter could have been written differently and in hindsight (because of the deck stacked against me), I should not have sent the letter, but instead, I could have filed the ethics complaint against the defendant's attorney and filed a motion for sanctions against the defendant's attorney in the Court case.

"Even though the formal complaint against me did not contain these charges, the panel found that I also violated Rule 4.4 and 8.4(d) because the letter embarrassed the defendant's attorney and impacted his attorney/client relationship with the defendant.

"After the panel reached its decision, the Kansas supreme court affirmed their [*sic*] decision.

"First of all, I disagree with the findings of the panel. I did then and I do now. Even though I disagree with the decision, there is nothing I can do about it now. In hindsight, I could have hired a defense attorney to represent me who had a prior relationship with the Board members. A single attorney in McPherson, Kansas probably does not have that much political capital with the Board members.

"I still believe that my actions against the defendant's attorney were legally sound and ethical. I did not communicate with the defendant, the plaintiff did. I did not impact the attorney/client relationship between the defendant and his attorney — his attorney did by threatening the defendant.

"After the underlying case, both the plaintiff and the defendant approached me and asked what they could do to help me in the complaint against me. They both

said that the complaint was a bunch of '@#$%' and they believed that the defendant's former attorney was retaliating against me for getting him removed from the case. They felt that the defendant's former attorney filed a complaint against me to take the focus off of his behavior. When they found out that the defendant's former attorney was a member of the Board investigating me and ultimately deciding my fate, they could not believe it.

"[Footnote: It is interesting to note that the defendant, about a year after the plaintiff's case against him was over, hired me to represent him in a claim against an insurance company.]"

Respondent then discussed at some length his personal experience with insurance companies. He said he had practiced insurance defense for several years and had become disenchanted. He also said he had had a bad personal experience with his own insurer. He then started his own practice in 1999 representing "real people in claims against insurance companies and in other general matters." The letter then continued:

"You may be wondering why I am ranting about insurance companies. One, it feels good to let some of this out because I deal with their antics all day long. Two, it is my opinion that the insurance company that insured the defendant in the underlying case may have yielded some influence in the complaint against me.

"What a better way to try to take me down, try to eliminate some of my aggressiveness and zealousness, and try to influence me so that I do not take a hard line against the insurance industry, then to try and embarrass me with an ethics complaint.

"If that is what they are hoping for, then once again, they are mistaken. I will continue to fight the good fight and I will continue to work hard representing individuals and real people who have value. . . .

"I know that this letter is lengthy, but I wanted to provide all of you with the necessary background so that you can understand what happened, why it happened, and so you can hear 'the rest of the story.'

"If any of you have any questions or want to discuss this matter further, please do not hesitate to give me a call. I thank all of you for your confidence in me as a person and as an attorney. I will continue to fight the good fight and I will not lie down and be defeated by the insurance industry. Thanks for hearing me out and God Bless.

. . . .

"P.S. The decision against me will have no effect on my law practice. The official term is a 'public censure,' which amounts to a public 'slap on the wrist.'

"I will continue to practice law, business and [sic] usual, a little wiser and a lot more leery of insurance companies and in [sic] the influence they exert."

The Disciplinary Administrator, having received a copy of the letter, filed a formal complaint against respondent on September 19, 2005, alleging the respondent

"intentionally misrepresented the outcome and seriousness of the disciplinary proceedings, attempted to shift blame for any wrongdoing from himself to others, intentionally minimized or trivialized his conduct found to be unethical by the Kansas Supreme Court, misrepresented facts and his own conduct, and knowingly called in question the integrity of the disciplinary process in Kansas by implying and directly stating the system was controlled by insurance companies and dishonest insurance company lawyers. Additionally, the respondent, by maintaining the righteousness of his conduct and trivializing the discipline imposed of '[published] censure', called into question his sincerity and the truthfulness of his representations of remorse before the panel hearing of April 21, 2003."

Specifically, the complaint accused respondent of violating Kansas Rule of Professional Conduct (KRPC) 7.1 (2006 Kan. Ct. R. Annot. 498) (false or misleading communication about lawyer or lawyer's services); KRPC 8.2(a) (2006 Kan. Ct. R. Annot. 508) (false statements concerning qualifications or integrity of public officer); KRPC 8.4(c) (2006 Kan. Ct. R. Annot. 511) (misconduct involving dishonesty, fraud, deceit, or misrepresentation); KRPC 8.4(d) (misconduct prejudicial to administration of justice); and KRPC 8.4(g) (conduct reflecting adversely on fitness to practice law).

Respondent filed his answer, not disputing any of the facts set out in the complaint but denying that the facts constituted any violation of the Kansas Rules of Professional Conduct. He also took exception to the Disciplinary Administrator's characterization of his intentions and the nature of his letter.

A hearing was held on January 12, 2005, at which respondent appeared in person and through counsel. The Disciplinary Administrator argued that the panel should recommend respondent be suspended from the practice of law for 2 years. Counsel for respondent urged the panel to conclude respondent had not violated any of the disciplinary rules. In the alternative, if the hearing panel concluded there was a violation, respondent's counsel suggested the appropriate sanction would be informal admonition. Respon-

dent addressed the panel personally and continued to argue that he violated no rule and that no discipline should be imposed.

The members of the hearing panel — Calvin Karlin, Jo Ann Butaud, and Craig Shultz — unanimously agreed that there was nothing in respondent's letter that violated KRPC 7.1, *i.e.*, the letter contained no false or misleading communication about respondent or his services. The members of the panel also unanimously agreed that respondent did not violate KRPC 8.4(g), *i.e.*, the letter did not constitute conduct that reflected adversely on respondent's fitness to practice law, in part "because there are more specific provisions of the Kansas Rules of Professional Conduct that apply."

With regard to the remainder of the alleged violations and appropriate discipline, the members of the panel could not reach agreement. Each member filed a separate opinion focusing on the same three passages from respondent's letter.

The first passage read:

"The panel also found that I violated Rule 8.4(g) when I wrote my letter to the defendant's attorney. I acknowledged that my letter could have been written differently and in hindsight (**because of the deck stacked against me**), I should not have sent the letter, but instead, I could have filed the ethics complaint against the defendant's attorney and filed a motion for sanctions against the defendant's attorney in the Court case." (Emphasis by Karlin.)

The second passage read:

"First of all, I disagree with the findings of the panel. I did then and I do now. Even though I disagree with the decision, there is nothing I can do about it now. **In hindsight, I could have hired a defense attorney to represent me who had a prior relationship with the Board members. A single attorney in McPherson, Kansas probably does not have that much political capital with the Board members.**" (Emphasis by Karlin.)

The third passage read:

"The defendant's attorney has been a member of this board for several years. My research shows that a large number of this board is filled by attorneys who work for law firms that defend insurance companies and their insureds. In fact, the three member panel that heard the complaint against me consisted of two members who work for law firms that defend insurance companies.

. . . .

"You may be wondering why I am ranting about insurance companies. One, it feels good to let some of this out because I deal with their antics all day long.

Two, **it is my opinion that the insurance company that insured the defendant in the underlying case may have yielded some influence in the complaint against me.**

"What better way to try to take me down, try to eliminate some of my aggressiveness and zealousness, and try to influence me so that I do not take a hard line against the insurance industry, then [*sic*] to try and embarrass me with an ethics complaint." (Emphasis by Karlin.)

## Karlin Opinion

Karlin concluded respondent violated KRPC 8.2(a) and KRPC 8.4(d) and recommended an informal admonition by the Disciplinary Administrator.

In his opinion, in which Butaud concurred, Karlin concluded that "[t]he Respondent's statement that the deck was stacked against him implies that the disciplinary process, the Disciplinary Administrator's office, the Kansas Board for Discipline of Attorneys, and the Kansas Supreme Court did not act properly." The second passage, according to Karlin, implied "that in order to prevail before the Kansas Board for Discipline of Attorneys, an attorney needs to have a prior relationship with the Kansas Board for Discipline of Attorneys and 'political capital.' " The third passage, in his view, implied "that the Kansas Board for Discipline of Attorneys was improperly influenced by an insurance company when it heard the Respondent's disciplinary case and therefore was biased against him."

Karlin noted that at the hearing, respondent had said what he meant to convey in the second passage was that he "could have hired a defense attorney who had a prior working relationship with the board members who had actually defended these types of cases before, which could have helped [him] get through the process," rather than representing himself. Karlin regarded this statement as "disingenuous."

In addition, Karlin wrote:

"The attack is clearly on the Board and how it works, not on the Respondent's own failing in representing himself. Our judicial system and discipline system depend upon the public's confidence. Reckless comments suggesting that the system is fixed, somehow biased against him, or controlled by insurance companies improperly and unethically attack the integrity of judges and the Board's adjudicatory officers in a manner that is prejudicial to the administration of justice."

As to the third passage, Karlin determined that the respondent communicated that members of the Kansas Board for Discipline of Attorneys represent insurance companies and their insureds, and the insurance company for the defendant in the case underlying *Pyle I* may have exercised inappropriate influence over the disciplinary proceeding.

Karlin discussed the scope of protection respondent enjoys under the free speech clauses of the federal and state constitutions, concluding "it is well-settled that the Kansas Rules of Professional Conduct can regulate and constrain a lawyer's speech." Karlin also distinguished *State v. Nelson*, 210 Kan. 637, 504 P.2d 211 (1972), the case respondent had relied on as requiring disposition in his favor.

That case began when lawyer James I. Nelson received a public censure from this court for misconduct. The day the opinion issued, a reporter sought him out; the reporter's newspaper later printed Nelson's statements that he had done "absolutely nothing wrong and they damn well know it"; that he had "very little respect for the police and the courts"; and that "[t]he Courts are commonly prejudiced and they're much more concerned with who appears before them than what the facts are, and the law is." 210 Kan. at 638.

These statements formed the basis of a second disciplinary complaint against Nelson, alleging violation of what was then denominated DR 1-102(A)(5) (misconduct prejudicial to the administration of justice) and DR 8-102(B) (knowingly making false accusations against a judge or other adjudicatory officer). The Supreme Court dismissed the disciplinary complaint against Nelson, concluding that, because (1) Nelson did not seek out the reporter, and (2) the critical statements were general in nature and directed broadly at all existing law enforcement and judicial institutions, discipline was not warranted. 210 Kan. at 643-44.

Karlin distinguished *Nelson* because DR 8-102(B) prohibited "*knowingly* making false accusations against a judge or other adjudicatory officer" (emphasis added), whereas the current rule also proscribes reckless conduct. See KRPC 8.2(a) (prohibits statement attorney "knows to be false *or with reckless disregard as to its truth*

*or falsity* concerning the qualifications or integrity of a judge, adjudicatory officer"). (Emphasis added.) Karlin also noted that the *Nelson* decision relied on distinguishing facts: (1) Nelson had been approached by the reporter; he did not seek him out; and (2) Nelson's comments were general rather than specific. In contrast, in Karlin's view, respondent here "took it upon himself to send out the letter," and his statements that (1) the deck was stacked against him; (2) he lacked sufficient political capital, implying such capital was necessary to prevail before the Disciplinary Board; and (3) the defendant's insurance company had wielded influence over the proceedings, were "specific assaults on the integrity of the disciplinary system, the Disciplinary Administrator's Office, the Kansas Board for Discipline of Attorneys, and the Kansas Supreme Court."

Karlin thus concluded there was clear and convincing evidence that respondent violated KRPC 8.2(a) by making false statements regarding the Board and the Supreme Court, and that respondent's "unrestrained statements" violated KRPC 8.4(d) by "prejudic[ing] justice in a general sense by lessening the public confidence in our disciplinary system."

Karlin considered the ABA Standards and concluded respondent knowingly violated his duty to the legal profession and the legal system to maintain his personal integrity and "caused potential injury to the legal profession and the legal system." Karlin counted respondent's prior discipline as an aggravating factor and concluded respondent's motivation was "purely selfish" in that he "wanted to lessen the impact of the Kansas Supreme Court's opinion on his friends, clients, and family members." Karlin further determined that respondent engaged in a pattern of misconduct because "he sent the letter to more than 281 friends, clients, and family members"; that respondent committed multiple offenses because he violated KRPC 8.2(a) and 8.4(d); that respondent had "substantial experience in the practice of law"; and that respondent refused to acknowledge the wrongful nature of his conduct because he denied any ethical lapse and "trivialized" the previous public censure as a "slap on the wrist." Karlin saw no "standard mitigating circumstances."

Karlin cited ABA Standard 7.4, which states: "Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in determining whether the lawyer's conduct violates a duty owed to the profession and causes little or no actual or potential injury to a client, the public, or the legal system," and recommended respondent be informally admonished.

## Butaud Opinion

In addition to concurring in Karlin's opinion, Butaud found a violation of KRPC 8.4(c) (misconduct involving dishonesty, fraud, deceit, or misrepresentation) and recommended a 6-month suspension.

To support her determination and recommendation, Butaud stated that the three passages of the letter contained "false and misleading" statements. She then pointed to respondent's repeated statements that he had filed a complaint against Conderman with the Disciplinary Administrator. These statements were, in Butaud's view, "completely false," and "it had already been judicially determined that the Respondent did not file a complaint against the attorney for the defendant."

Butaud also took issue with respondent's statement that "at no time did [he] ever communicate with the defendant" in the litigation underlying the previous disciplinary case. "In fact," Butaud wrote, "it had been judicially determined that [respondent] communicated directly with the defendant."

Butaud also cited respondent's related statements that his prior discipline "relied on a former version of [KRPC 4.2] which prevented a lawyer from 'causing another to communicate' " with a represented party, that "the old rule does not apply to my case," and that "the current version of the rule specifically allows for parties to communicate with one another." Butaud determined that these statements also were false and misleading and concluded Respondent knowingly violated KRPC 8.4(c), a "serious violation." She noted that "[a] lawyer should not, by the use of unfounded or false statements, attack the integrity of the system or create disrespect for the courts."

With regard to sanctions, Butaud considered ABA Standard 7.2, which states that "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system." She concluded that "the lessons that the Respondent should have learned following his first disciplinary case were wholly ignored. Accordingly, because of the serious nature of Respondent's misconduct, because I conclude that he engaged in conduct that involves dishonesty — making false and misleading statements — and in order to assist the Respondent in understanding the serious nature of the disciplinary offense, I recommend that the Court issue an order suspending the Respondent from the practice of law for a period of six months."

Shultz Opinion

Shultz found no violations and would have dismissed the complaint. In the alternative, he suggested that any violations merited no greater sanction than informal admonition. Shultz agreed that the three passages in the letter "rais[ed] legitimate questions with respect to the allegations" against respondent but did not rise to the level of a violation of any of the rules.

In regard to Rule 8.4(c) (misconduct involving dishonesty, fraud, deceit, or misrepresentation), Shultz wrote:

"One can imagine numerous actions that may be contrary to the requirements of this rule but such prohibition seems best applied to actions other than out of court statements, particularly those of opinion. My review of the case summaries digested in connection with Rule 8.4 suggests the rule has typically been applied to actions such as theft, lying, forgery, commission of a crime, or mishandling money or some other aspect of a case. The statements contained in Respondent's letter do not, in my opinion, come close to reflecting some intentional decision to be dishonest or commit fraud, deceit, or misrepresentation."

In regard to KRPC 8.4(d) (misconduct prejudicial to the administration of justice), Shultz relied in part on his reasoning regarding KRPC 8.4(c). In addition, Shultz argued that respondent's " 'post-decision' statements of opinion, even if wrong, do not prejudice the administration of justice."

Shultz noted that KRPC 8.2(a) was the only one of the three rules at issue that prohibited "statements" and that, "with fair reading, can be urged to have been violated here." Shultz interpreted the rule to require clear and convincing evidence establishing that respondent made a statement about the qualifications or integrity of a judge or adjudicatory officer that he knew to be false, or that the statement was false and was made by respondent in reckless disregard of its truth or falsity. He further posited that the burden of proving the falsity of statements lay "not with the Respondent but with the Office of the Disciplinary Administrator. In the hearing before this panel, no evidence was presented that any statement was in fact false. . . . [W]e are not entitled to presume their falseness."

Shultz specifically expressed his disinclination to presume that the defendant's insurance company did not wield some influence, or that a judge is never influenced, even unintentionally, by " 'political capital' . . . to the exclusion of Respondent's explanation that what he meant by that was that having a lawyer familiar with disciplinary matters would have been better." He argued that respondent's "comment about the deck being stacked against him was . . . susceptible [of] only one meaning and that being false." Shultz determined that the Disciplinary Administrator presented no evidence on these issues, therefore precluding the panel from presuming falsity, to the exclusion of other possible meanings for respondent's statements.

Shultz also tempered Karlin's reading of the *Nelson* decision by suggesting that it supported respondent's right to criticize not only the decision against him but also those who rendered that decision. Shultz opined that respondent's statements, "at worst, cannot be interpreted to be any more critical than [those] approved by the Supreme Court in [*Nelson*]."

Shultz also found the apparent origin of the complaint in this case significant. The Disciplinary Administrator testified that a copy of respondent's letter arrived in an unmarked envelope from an anonymous source. Shultz observed that the letter bore markings from a fax machine in the office of Farmers Alliance Insurance Company, "[which has its] home office in McPherson, Kansas, the

very town in which [Respondent] practices . . . . While not clearly relevant . . . the fact that Farmers Alliance played any part in the commencement of this matter at least suggests that Respondent's opinions or fears of influence by insurance companies do not necessarily all arise as pure paranoia or reckless disregard."

Shultz concluded that "the letter sent by Mr. Pyle was neither wise nor persuasive. But some lack of common sense . . . does not entitle us to recommend punishment for such behavior. His letter reflects his thoughts and opinions, however misguided, all of which ought to enjoy First Amendment protections to the exclusion of this Complaint . . . . [R]estrictions on a lawyer's freedom of speech should not apply to the *means* and *manner* of those statements before us in this case." In addition, he wrote, "[I]f the rationale for discipline here is to prevent damage to the reputation of the judiciary or the legal process or to otherwise prevent damage to the public's opinion of such," that purpose would not be well-served by imposing discipline in this case; in particular, discipline any more severe than informal admonishment may "do far more damage" than any which may have resulted from Respondent's letter to the extent that it could "be seen as . . . attempting to prevent criticism [of the judiciary] by anyone in the legal profession." In Shultz' view, "Suspension for this criticism is neither justified nor should it be desired . . . . And whereas the only other motive for such a remedy would seem to be to punish Mr. Pyle to prove we have the power to do so or because the system resents his comments, such discipline should be avoided."

## Analysis

Respondent did not contest any of the facts set out in the panel's final hearing report, but he took exception to the conclusions by Karlin and Butaud that his conduct constituted a violation of any of the rules.

Generally, in disciplinary cases, this court will adopt the panel's final hearing report "where amply sustained by the evidence, but not where it is against the clear weight of the evidence. [Citations omitted.]" *In re Lober,* 276 Kan. 633, 636-37, 78 P.3d 442 (2003).

Where, as here, a majority of the members of the panel agreed only on the existence of two of five violations alleged and no majority supported any single recommended discipline, we are especially mindful of our customary comprehensive standard of review. We independently consider "the evidence, the findings of the disciplinary panel, and the arguments of the parties and determine[] whether violations of KRPC exist and, if they do, what discipline should be imposed. [Citation omitted.] Any attorney misconduct must be established by substantial, clear, convincing, and satisfactory evidence." *Lober,* 276 Kan. at 636; *In re Boone,* 269 Kan. 484, 498, 7 P.3d 270 (2000). Any panel recommendation on sanction is advisory only and shall not prevent this court from imposing greater or lesser discipline. Rule 212(f) (2006 Kan. Ct. R. Annot. 295).

The three passages cited consistently by each of the members of the hearing panel may have been particularly troubling to them, but we believe respondent's letter and its necessary implications should be viewed holistically. With this in mind, it is plain from the necessarily undisputed language used in the letter that it was calculated not only to, as respondent asserted, provide its more than 281 recipients "with some insight" about the public censure handed down by this court but also to:

- Reargue whether respondent violated any rules of professional conduct and whether he was deserving of any punishment;
- Portray a "large number" of the members of the Board of Discipline as lackeys for the insurance industry and some undefined number of members as susceptible to improper influence by prior relationships with respondents or "political capital" possessed by those respondents;
- Indicate that the members of his hearing panel erred as a matter of law in relying on an outdated version of Rule 4.2;
- Communicate that he had always disagreed and continued to disagree with the panel's findings, which had been accepted by this court;
- Explain the source of his animosity toward insurers and publish his theory that the particular insurance company involved in the litigation underlying his discipline had brought pressure to bear on the Disciplinary Administrator, the Disciplinary Board, and/

or this court to make sure he was punished for his legitimate advocacy; and, finally,

- Minimize the significance of the level of sanction imposed by this court, *i.e.*, equate his published censure to a "public 'slap on the wrist' " with no effect on his practice.

Like *Nelson*, 210 Kan. 637, this case requires us to navigate the tension between First Amendment freedom of speech, enjoyed by all citizens, and the limits that can be placed on exercise of that freedom because a particular citizen chose to become a Kansas lawyer. We first review our other previous cases addressing this tension.

*In re Johnson*, 240 Kan. 334, 729 P.2d 1175 (1986), was a contested case in which this court found that Johnson should be disciplined for false, unsupported criticisms and misleading statements about his opponent in a county attorney election campaign. In its discussion of the First Amendment and lawyer speech, this court said:

"A lawyer, as a citizen, has a right to criticize a judge or other adjudicatory officer publicly. To exercise this right, the lawyer must be certain of the merit of the complaint, use appropriate language, and avoid petty criticisms. Unrestrained and intemperate statements against a judge or adjudicatory officer lessen public confidence in our legal system. Criticisms motivated by reasons other than a desire to improve the legal system are not justified." *Johnson*, 240 Kan. at 336.

Our *Johnson* case also stands for the proposition that a lawyer cannot insulate himself or herself from discipline by characterizing questionable statements as opinions. See *Johnson*, 240 Kan. at 339. As one panel of the Seventh Circuit has observed, "[e]ven a statement cast in the form of an opinion ('I think that Judge X is dishonest') implies a factual basis, and the lack of support for that implied factual assertion may be a proper basis for a penalty." *Matter of Palmisano*, 70 F.3d 483, 487 (7th Cir. 1995), *cert. denied* 517 U.S. 1223 (1996); see also *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990) (" 'In my opinion John Jones is a liar' . . . implies a knowledge of facts which lead to the conclusion that Jones told an untruth.").

In *State v. Russell*, 227 Kan. 897, 610 P.2d 1122, *cert. denied* 449 U.S. 983 (1980), respondent made false statements while run-

ning for a position on the Board of Public Utilities, and we concluded that the comments were not protected speech:

"[L]awyers are subject to discipline for improper conduct in connection with business activities, individual or personal activities, and activities as a judicial, governmental or public official. [Citations omitted.] A lawyer is bound by the Code of Professional Responsibility adopted by rule of this court in every capacity in which the lawyer acts, whether acting as a lawyer or not." *Russell*, 227 Kan. at 902.

In the much more recent case of *In re Landrith*, 280 Kan. 619, 124 P.3d 467 (2005), this court disbarred an attorney for, among other violations, his repeated baseless, inflammatory, and false accusations against opposing counsel, judges, state district court employees, Court of Appeals staff, and municipal officers and employees. Specifically, respondent Brett Landrith had accused a particular judge of being racist and had maintained that one of his clients lost his lawsuit because of the client's race. Landrith also accused members of the court and Disciplinary Administrator's office of operating a baby smuggling ring; he accused a current Supreme Court justice and another judge of mismanaging funds; and he accused district court staff and others of obstructing justice. *Landrith*, 280 Kan. at 631-34, 638-39, 644.

Landrith produced no evidence to support any of his accusations but argued that the First Amendment protected his speech. We rejected his argument, emphasizing that, in those instances where a lawyer's unbridled speech amounts to misconduct that threatens a significant State interest, it is clear that a State may restrict the lawyer's exercise of personal rights guaranteed by the federal and state Constitutions. See *N.A.A.C.P. v. Button*, 371 U.S. 415, 438, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963).

"Upon admission to the bar of this state, attorneys assume certain duties as officers of the court. Among the duties imposed upon attorneys is the duty to maintain the respect due to the courts of justice and to judicial officers. A lawyer is bound by the Code of Professional Responsibility in every capacity in which the lawyer acts, whether he is acting as an attorney or not, and is subject to discipline even when involved in nonlegal matters, including campaigns for nonjudicial public office." *Johnson*, 240 Kan. at 337.

A lawyer's right to free speech is tempered by his or her obligations to the courts and the bar, obligations ordinary citizens do

not undertake. *Nelson*, 210 Kan. at 640; see *In re Sawyer*, 360 U.S. 622, 3 L. Ed. 2d 1473, 79 S. Ct. 1376 (1959).

Turning to this case, before addressing Rules 8.2(a) and 8.4(c) and (d), we pause to mention the Disciplinary Administrator's initial additional allegations that respondent's conduct violated KRPC 7.1 and 8.4(g). Because no member of the panel determined that a violation of either of these provisions occurred, and the Disciplinary Administrator took no exceptions to these negative findings, the allegations are not before us.

Rule 8.2(a)

KRPC 8.2(a) states:

"A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office."

The comment to this rule includes the following language:

"Assessments by lawyers are relied on in evaluating the professional or personal fitness of persons being considered for election or appointment to judicial office and to public legal offices, such as attorney general, prosecuting attorney and public defender. Expressing honest and candid opinions on such matters contributes to improving the administration of justice. Conversely, false statements by a lawyer can unfairly undermine public confidence in the administration of justice.

. . . .

"To maintain the fair and independent administration of justice, lawyers are encouraged to continue traditional efforts to defend judges and courts unjustly criticized."

Rule 8.2(a) enables carefully circumscribed control over lawyer speech by prohibiting only false statements "concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer" and only when the lawyer either knew them to be false or displayed reckless disregard for their truth or falsity. Derogatory factual allegations that are false and with ordinary care ought to have been known to be such can lead to sanction. *Russell*, 227 Kan. at 901. Rule 8.2(a), in general, strikes an appropriate balance between right and responsibility.

As we said in *Nelson*:

"Generally, courts are in agreement that while a lawyer may, in a proper tone and through appropriate channels, attack the integrity or competence of a court or judge, or the propriety of any particular judicial act, he may not, by unfounded charges, create disrespect for courts or their decisions and if he does so he may be properly disciplined. Attorneys have wide latitude in differing with, and criticizing the opinions of the courts, yet when they resort to misrepresentation and unwarranted assaults on the courts whose officers they are, they violate their duty and obligation and are subject to discipline. [Citation omitted.]" *Nelson,* 210 Kan. at 642.

Our decision in *Nelson* also quoted Justice David J. Brewer, who wrote in the 1877 contempt citation case of *In re Pryor:*

" 'For no judge, and no court, high or low, is beyond the reach of public and individual criticism. After a case is disposed of, a court or judge has no power to compel the public, or any individual thereof, attorney or otherwise, to consider his rulings correct, his conduct proper, or even his integrity free from stain, or to punish for contempt any mere criticism or animadversion thereon, no matter how severe or unjust. . . .

" 'We remark again, that a judge will generally *and wisely* pass unnoticed any mere hasty and unguarded expression of passion, or at least pass it with simply a reproof. It is so that, in every case where a judge decides *for* one party, he decides *against* another; and ofttimes both parties are beforehand equally confident and sanguine. The disappointment therefore is great, and it is not in human nature that there should be other than bitter feeling, which often reaches to the judge as the cause of the supposed wrong. A judge therefore ought to be patient, and tolerant of everything which appears but the momentary outbreak of disappointment.' " 210 Kan. at 642-43 (quoting *In re Pryor,* 18 Kan. 72, 76 [1877]).

Of the multiple messages communicated by respondent in his letter, listed above, most do not concern the "qualifications or integrity of a judge, adjudicatory officer or public legal officer," as required to run afoul of Rule 8.2(a) (2006 Kan. Ct. R. Annot. 508). One message — the second in the list — can be fairly characterized as comment on the "qualification or integrity" of members of the Disciplinary Board, and it put a sinister spin on meager facts. However, it was minimally supported by respondent's research on representative clients of Board members' law firms and by his explanation during his testimony of what he meant to convey, *i.e.,* that he believed he would have fared better before the panel if he had employed counsel experienced in disciplinary matters. Under these circumstances, although it is a close case, we strike the critical

balance between the First Amendment and disciplinary imperatives in respondent's favor, concluding there was insufficient clear and convincing evidence that he knew or should have known his letter was making false statements of fact about Board members' qualifications and integrity.

## Rule 8.4(c)

Rule 8.4(c) states that "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." (2006 Kan. Ct. R. Annot. 510-11).

There have been fewer than 50 cases in which this court has found that an attorney has violated this rule in its current form. See, *e.g., In re Christian,* 281 Kan. 1203, 135 P.3d 1062 (2006) (attorney engaged in dishonesty in violation of KRPC 8.4(c) by knowingly and repeatedly converting attorney fees belonging to the firm for his own use; disbarment); *In re Boaten,* 281 Kan. 390, 132 P.3d 870 (2006) (attorney converted to his own use settlement proceeds belonging to his clients and repeatedly testified falsely before the hearing panel; disbarment); *In re Mitchell,* 280 Kan. 656, 123 P.3d 1279 (2005) (attorney informed client that she attended a hearing in his child support action and that the court took the matter under advisement; she had not attended hearing; default judgment was entered against client; 1-year suspension, 2-year probation); *In re Landrith,* 280 Kan. 619 (numerous violations through false accusations against others; disbarment); *In re Devkota,* 280 Kan. 650, 123 P.3d 1289 (2005) (attorney engaged in dishonest conduct by signing his clients' names to answers to interrogatories and prevailing upon his non-lawyer employee to verify, by notarization, that the false signatures were genuine; public censure); *In re Ware,* 279 Kan. 884, 112 P.3d 155 (2005) (attorney, as in-house counsel, falsified employer's internal documents to make it appear as though she had taken action on a discrimination case filed against it when she had not; 1-year suspension); *In re Wenger,* 279 Kan. 895, 112 P.3d 199 (2005) (attorney engaged in dishonest conduct by advising his clients that he had filed cases and set hearings and doctor's appointments when he in fact had not; disbarment); *In re Nathanson,* 279 Kan. 921, 112 P.3d 162

(2005) (attorney prepared, fraudulently signed, and filed pleadings and correspondence using name of another attorney; disbarment); *In re Islas*, 279 Kan. 930, 112 P.3d 210 (2005) (attorney's actions gave rise to convictions for making false writings and making false application for driver's license; attorney's false statement to driver's licensing agency when he attempted to avoid license suspension, and later attempted to reinstate his license, constituted violation of KRPC 8.4(c); indefinite suspension); *In re Singleton*, 279 Kan. 515, 111 P.3d 630 (2005) (attorney misrepresented documents to judge; indefinite suspension); *In re Rock*, 279 Kan. 257, 105 P.3d 1290 (2005) (attorney converted client funds, abandoned clients, and committed other misconduct; disbarment).

The exemplary cases cited above demonstrate that, in the past, this rule generally has been invoked to discipline lawyers who engaged in conduct significantly more egregious than respondent's conduct here. Indeed, by comparison, respondent's conduct ranks as mere whining — petty, annoying, and childish, but far from the dramatic abandonment of honest practice that typifies our Rule 8.4(c) cases.

Butaud was the sole member of the panel who would have held respondent's conduct violated this provision. To illustrate, her opinion focused on, among other things, respondent's statements that he had filed a disciplinary complaint against Conderman; that he had not communicated with the defendant in the litigation underlying his prior discipline; and that the Board and court relied on an outdated version of Rule 4.2. (2006 Kan. Ct. R. Annot. 487).

The first statement involved a contested question of fact. In the prior disciplinary case, respondent insisted his inclusion of a paragraph in his letter to the Disciplinary Administrator, which gave his opinion of what he regarded as Conderman's misconduct, satisfied Rule 8.3. (2006 Kan. Ct. R. Annot. 509). The panel and court decided against respondent on this issue, but that does not mean respondent's argument was invalid or objectively false.

The second statement regarding communication with the defendant was factually accurate, insofar as *direct* communication was concerned. Of course this unwritten limitation placed respondent's conduct in the best possible light, but the letter did otherwise detail

the facts forming the basis of the panel's and court's displeasure over respondent's *indirect* communication with a represented opposing party. The letter owned up to respondent preparing an affidavit for the defendant at respondent's client's request; to his mailing of the affidavit to the client; and to the client's subsequent discussion of it with the defendant. Respondent also acknowledged the unethical nature of *direct* conduct with a represented party. These aspects of the letter mitigated respondent's categorical statement that "[a]t no time did I ever communicate with the defendant." When read in context, it was obvious that the hearing panel and the court had disagreed with respondent's narrow interpretation of the communication prohibition.

Respondent's third statement that the panel and court relied on an old version of Rule 4.2 was incorrect, but we discern mistake rather than malevolence. Respondent was correct that an earlier version of the rule prohibited an attorney from communicating with a represented party and from causing others to do acts he could not do. The current version of Rule 4.2, which has been in effect since 1988, does not contain the indirect contact limitation, and it does permit opposing parties to communicate directly. However, the reason respondent was found in violation of Rule 4.2 was his misconduct under 8.4(a), which incorporates the indirect contact element of the earlier Rule 4.2 and prohibits an attorney from "[v]iolat[ing] or attempt[ing] to violate the rules of professional conduct . . . through the acts of another." KRPC 8.4(a); *Pyle*, 278 Kan. at 235, 236-39. It appears likely the significance of the court's explanation of this subtlety was simply lost on respondent.

We conclude that there was no clear and convincing evidence that respondent violated Rule 8.4(c).

Rule 8.4(d)

Rule 8.4(d) states that "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." (2006 Kan. Ct. R. Annot. 510).

Karlin, with Butaud, determined that respondent violated this rule because his comments "prejudiced justice in a general sense by lessening the public confidence in our disciplinary system." Re-

spondent argues, and Shultz' opinion urges, that this court should rule there can be no prejudice to the administration of justice once justice has been administered, that is, once an adjudication is complete. In their view, because respondent's discipline case had ended by the time he sent his letter, he was free to say what he wished without violating Rule 8.4(d).

Although in *Nelson* we found no prejudice to the administration of justice and later noted that,"[s]ince Nelson's disciplinary case was terminated, any statements made by Nelson could not serve as harassment or intimidation for the purpose of influencing a decision in that case," we rejected an invitation to limit the application of the rule regarding prejudice to the administration of justice only to conduct occurring during the pendency of trial. *In re Johnson*, 240 Kan. 334, 342, 729 P.2d 1175 (1986) (discussing *In re Nelson*, 210 Kan. 637, 504 P.2d 211 [1972]). We explicitly refused to adopt this "proposition in the absolute form." *Nelson*, 210 Kan. at 641.

Our subsequent cases have not clearly answered the question *Nelson* thus left open — whether Rule 8.4(d) can be invoked to discipline conduct arising after a particular adjudicatory proceeding is concluded. Our *Landrith* opinion suggested that Landrith's inflammatory accusations in *and* out of the courtroom and *after* proceedings concluded would support our conclusion that 8.4(d) was violated. *Landrith*, 280 Kan. at 619. And, in at least one other case, we have disciplined an attorney for conduct occurring after a proceeding was completed, although we have done so under a different subsection of Rule 8.4. See *In re Arnold*, 274 Kan. 761, 767, 772-74, 56 P.3d 259 (2002) (public censure under, *inter alia*, Rule 8.4(g) prohibiting conduct reflecting adversely on fitness to practice law).

The approach to 8.4(d) and similar rules in other jurisdictions varies. See *Matter of Palmisano*, 70 F.3d 483, 485-87 (7th Cir. 1995) (attorney disciplined for making many baseless accusations, among other times, after being relieved as counsel in case); *Standing Committee on Discipline v. Yagman*, 55 F.3d 1430, 1437-40 (9th. Cir. 1995) (First Amendment protected attorney's criticism of judge who sanctioned attorney; attorney accused judge of being anti-Semitic, dishonest); *In re Green*, 11 P.3d 1078, 1083-87 (Colo.

2000) (several months after final order and award, but while motion to reconsider attorney fee award pending, attorney permitted to say judge considering motion was racist); *In re Crenshaw*, 815 N.E. 2d 1013, 1014-15, (Ind. 2004) (untrue allegations against judges, during and after proceedings, merit sanction); *Kentucky Bar Association v. Williams*, 682 S.W.2d 784, 786 (Ky. 1984) (disrespectful letter written to judge after hearing warrants discipline); *Grievance Administrator v. Fieger*, 476 Mich. 231, 719 N.W.2d 123 (2006), *cert. denied* 127 S. Ct. 1257 (2007) (vulgar attacks made by attorney on radio show after members of appellate panel ruled against attorney's client not protected; case still pending because time for further appeal unexpired); *Mississippi Bar v. Lumumba*, 912 So. 2d 871, 881-84 (Miss.), *cert. denied* 163 L. Ed. 2d 70 (2005); (attorney disciplined for in-court behavior as well as later out-of-court statement still connected to judicial proceeding); *Matter of Westfall*, 808 S.W.2d 829, 831-33 (Mo.) (discipline permitted for prosecutor's televised statement on day after opinion filed that appellate judge's ruling "a little bit less than honest," designed "to arrive at a decision that he personally likes"), *cert. denied* 502 U.S. 1009 (1991); *In re Holtzman*, 573 N.Y.S.2d 39, 42, 78 N.Y.2d 184, 577 N.E.2d 30 (1991) (dissemination of letter of complaint, press contacts after proceeding concluded "prejudicial to administration of justice"); *State ex rel. Oklahoma Bar Ass'n v. Porter*, 766 P.2d 958, 964-70 (Okla. 1988) (attorney protected by First Amendment when voicing criticism of judge to news media immediately after conclusion of trial, sentencing); *Ramsey v. Board of Professional Responsibility*, 771 S.W.2d 116, 120-22 (Tenn. 1989) (prosecutor's disrespectful behavior in court prejudicial to justice, but general comments regarding judge made to news media protected).

We agree with Karlin and Butaud that the "administration of justice" Rule 8.4(d) seeks to protect from prejudice is much broader than the administration of justice to be effected in any single trial or adjudicatory proceeding. The plain language of the rule supports this view, as does the weight of the persuasive interpreting authority. Among other things, adopting respondent's narrow reading would effectively exempt all non-litigator lawyers from the rule's control, a nonsensical result. *All* lawyers, by virtue of their

licenses, enjoy the status of officers of the court. That status brings with it the responsibility to refrain from conduct unbecoming such officers, to uphold the rule of law, and to enhance public confidence in that rule and the legal system set up to safeguard it.

"As an officer of the court, a member of the bar enjoys singular powers that others do not possess; by virtue of admission, members of the bar share a kind of monopoly granted only to lawyers. Admission creates a license not only to advise and counsel clients but also to appear in court and try cases; as an officer of the court, a lawyer can cause persons to drop their private affairs and be called as witnesses in court, and for depositions and other pretrial processes that, while subject to the ultimate control of the court, may be conducted outside courtrooms. The license granted by the court requires members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of justice." *In re Snyder*, 472 U.S. 634, 644-45, 86 L. Ed. 2d 504, 105 S. Ct. 2874 (1985).

As Justice Potter Stewart put it in his concurrence in an earlier case:

"[A] lawyer belongs to a profession with inherited standards of propriety and honor, which experience has shown necessary in a calling dedicated to the accomplishment of justice. He who would follow that calling must conform to those standards.

"Obedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech." *In re Sawyer*, 360 U.S. 622, 646-47, 3 L. Ed. 2d 1473, 79 S. Ct. 1376 (1959).

Did respondent's mailing of his letter 19 days after his discipline to more than 281 addressees constitute conduct prejudicial to the administration of justice? It did. His minimal research may have supported the existence of certain previous relationships between insurance industry clients and some group of members of the Disciplinary Board; he may truly have realized too late that he should have hired counsel to represent him in his disciplinary proceeding; he may have had previous unpleasant dealings with his own insurance company and suspected an insurance company's involvement in alerting the disciplinary office to his behavior. Even if he was correct in all of these respects, even if his personal animosity toward the insurance industry was somehow justified, his wholesale indictment of the Kansas disciplinary process as "stacked against him" was not. Rule 8.4(d) can be violated by conduct unbecoming

an officer of the court, even if a legal proceeding has ended and even if the lawyer stops somewhere short of spreading outright lies.

Members of the Disciplinary Board serve as judges or commissioners in the Kansas disciplinary process. Our society has a substantial interest in protecting them and other actors in the process from unfounded attacks, and it may do so without running afoul of a disciplined attorney's First Amendment rights. There is a line between just and unjust criticism. Respondent crossed it. This is evident from his plainly selfish motive. He displayed no desire to improve the disciplinary system, only to excuse its focus on him.

"Some judges are dishonest; their identification and removal is a matter of high priority in order to promote a justified public confidence in the judicial system. Indiscriminate accusations of dishonesty, by contrast, do not help cleanse the judicial system of miscreants yet do impair its functioning — for judges do not take to the talk shows to defend themselves, and few litigants can separate accurate from spurious claims of judicial misconduct." *Palmisano*, 70 F.3d at 487.

We need not decide in this case whether, to prove a violation of Rule 8.4(d), the Disciplinary Administrator must demonstrate actual harm to the administration of justice. We note only that such actual harm was proved here. Testimony at the hearing before Karlin, Butaud, and Shultz established that respondent received several responses to his letter. At least some of these responses indicated that the letter had persuaded the recipient that respondent could not get a fair hearing, *i.e.*, that he had been "burned" only because he had the audacity to "stir the pot" in an oppressively unfriendly forum, one much more welcoming to insurance company interests. This testimony illustrated the point of the following statement, made in connection with Rule 8.2 but equally applicable to 8.4(d): "Precisely because lawyers are perceived to have special competence in assessing judges, the public tends to believe what lawyers say about judges, even when lawyers speak inappropriately or make claims about which they are uncertain." *Maintaining the Integrity of the Professional*, ABA Annotated Model Rules of Professional Conduct Rule 8.2, Annotation, p. 585 (5th ed. 2003).

Under these circumstances, we conclude that the Disciplinary Administrator marshaled clear and convincing evidence that respondent violated Rule 8.4(d). Respondent made a calculated de-

cision to send his letter impugning the integrity of all involved in the Kansas disciplinary process for lawyers. Unlike the respondent in *Nelson*, he did not merely extemporize in answer to sudden press questions coming on the heels of discipline. Rather, he took time to digest this court's decision and then chose to write a lengthy letter to hundreds of readers, shifting blame for his discipline from himself to an allegedly crooked system. In addition, despite his earlier admission of a Rule 8.4(g) violation and his contrition before this court, respondent asserted to the letter's recipients that he had never agreed with criticism of his behavior. Finally, and, in some-ways, most troubling, respondent belittled the court's public censure as a "slap on the wrist." All of these statements in his widely published letter qualify as conduct prejudicial to the administration of justice under Rule 8.4(d).

## Sanction

The Disciplinary Administrator seeks a 2-year suspension of respondent's law license. Karlin recommended informal admonition; Butaud, a 6-month suspension; and Shultz, if any discipline was deemed warranted, informal admonition. A majority of the court believes a 3-month suspension is appropriate; a minority of the court would impose a less severe sanction. The majority acknowledges that a less severe sanction might have been acceptable had respondent not already trivialized the import and impact of published censure. In short, respondent's inappropriate behavior and statements in response to *Pyle I* leave us no avenue other than harsher discipline to get his attention and motivate improved attitude and conduct.

IT IS THEREFORE ORDERED that respondent, E. Thomas Pyle, III, be and he is hereby suspended from the practice of law in the state of Kansas for a period of 3 months beginning April 27, 2007, the date of our opinion. Costs of this proceeding shall be assessed to the respondent, and this opinion shall be published in the official Kansas Reports.

LUCKERT, J., not participating.

LOCKETT, J., Retired, assigned.