No. 99,691

In the Matter of DIANE LYNN HILLBRANT, *Respondent*.
(182 P.3d 1253)

Opinion filed May 16, 2008.

*Frank D. Diehl*, deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett*, disciplinary administrator, was with him on the formal complaint for petitioner.

*John J. Ambrosio*, of Topeka, argued the cause for respondent, and *Diane L. Hillbrant*, respondent, argued the cause pro se.

*Per Curiam*: This is an original uncontested proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Diane L. Hillbrant, an attorney admitted to the practice of law in Kansas in September 1984. Respondent is also admitted to the practice of law in the state of Illinois. Respondent's last registration address with the Clerk of the Appellate Courts of Kansas is in Shoreview, Minnesota. Respondent is not licensed to practice law in the state of Minnesota.

The complaint against respondent arises out of her unauthorized practice of law in the state of Minnesota. In April 2004 respondent was charged with six counts of the unauthorized practice of law in violation of Minnesota Statute § 481.02, sub. 1 (2002). A jury convicted respondent of five of the six counts, the State having dismissed the sixth count. On April 15, 2005, respondent was sentenced to 90 days on each count to be served consecutively. Respondent was fined $1,000 per count. Respondent's sentence was suspended. The district court also ordered respondent to pay restitution to the defendants who were the object of her unauthorized practice of law in the total amount of $19,698.45. Respondent's convictions and restitution were affirmed on appeal. Based on respondent's misconduct in Minnesota, the state of Illinois suspended respondent's license to practice law in that state for 1 month.

The formal complaint here charged respondent with violating Kansas Rules of Professional Conduct (KRPC) 1.1 (2007 Kan. Ct. R. Annot. 384) (competence), KRPC 4.1 (2007 Kan. Ct. R. Annot. 527) (truthfulness in statements to others), KRPC 4.2 (2007 Kan. Ct. R. Annot. 530) (communication with person represented by counsel), KRPC 4.4 (2007 Kan. Ct. R. Annot. 532) (respect for the rights of third persons), KRPC 5.5 (2007 Kan. Ct. R. Annot. 539) (unauthorized practice of law), and KRPC 8.4(c) (2007 Kan. Ct. R. Annot. 559) (engage in conduct involving dishonesty, fraud, deceit or misrepresentation). Respondent filed an answer to the formal complaint.

The Kansas Board for Discipline of Attorneys held a hearing on May 22, 2007. Respondent appeared in person and through counsel. At the hearing, respondent stipulated to the admission of Disciplinary Administrator's Exhibits 1 through 30. Respondent further stipulated to the factual allegations contained in the formal complaint and to violations of KRPC 1.1, KRPC 4.1, KRPC 4.2, KRPC 4.4, KRPC 5.5, and KRPC 8.4(c).

## HEARING PANEL FINDINGS

The hearing panel found the following facts by clear and convincing evidence:

"1. Diane L. Hillbrant (hereinafter 'the Respondent') is an attorney at law, Kansas Attorney Registration No. 12064. Her last registration address with the Clerk of the Appellate Courts of Kansas is . . . Shoreview, Minnesota 55126-3513. The Respondent was admitted to the practice of law in the state of Kansas on September 28, 1984, and her date of birth is September 7, 1956.

"2. In addition to being licensed to practice law in the State of Kansas, the Respondent is also licensed to practice law in the State of Illinois. The Respondent, however, has not been licensed to practice law in the State of Minnesota.

"3. The Respondent also holds licenses to practice pharmacy in Kansas and Minnesota.

"4. Beginning in April, 2003, the Respondent engaged in the unauthorized practice of law in the State of Minnesota. She provided representation to a number of individuals who purported to have suffered damage by construction companies for allegedly providing defective products and workmanship.

"5. The Respondent engaged in a pattern of unprofessional and abusive contact with officials with the construction companies. The Respondent included false information in her communications. Further, the Respondent repeatedly con-

tacted represented parties without authorization from their counsel. For example, on May 20, 2003, the Respondent wrote to Stuart A. Miller, Presiding [*sic*] and Chief Executive Office[r] of the Lennar Corporation. In the letter the Respondent stated:

'Our tentatively scheduled court date is in Washington D.C. at EPA headquarters on 15 December 2003 at 9:00 AM EST. It will be televised nationally, just like the Delcon Shield case was.

'We are also suing you for reformation and reparation for 2.5 billion dollars for your company as an environmental hazard to the nation and it's [*sic*] people. The court case for the reformation hearing is to be scheduled for 15 April 2004 at EPA headquarters in Washington D.C. The reformation will also be televised nationally.

. . . .

'We are closed to informing you of any more details about the cases than we already have. We want you to be aware that the Delcon Shield Company went out of business and was not able to meet all of its reciprocity charges. Two of the members of the Board of Directors and the CEO are still in prison for "white collar crime" and the rest of the Board of Directors and a third of the management staff are still having their salaries garnisheed by the public government and probably will continue to be under this situation for the rest of their lives.'

The Respondent did not have hearings scheduled with the EPA. The statements that she had hearings scheduled was false.

"6. On June 26, 2003, the Respondent wrote to Paul Woodward, Owner of American Building Contractors, Inc. In the letter, the Respondent stated:

'Enclosed [*sic*] the Mold Inspection Report that will win in the class action suit court case on 15 July 2003. The Mold Inspectors are EPA Certified, in business for over 20 years . . . .

'My client will receive due process in court unless you replace her roof and pay her damages plus attorney's fees right now, so my client can sell her home and move to a new place of residence. If you do not do this now, we will see you in court on the 15th of July and the jury will end up awarding my client much more money than we are asking for . . . .

'You won't be getting out of this. I will make sure of it, as I am an attorney that works in three states, specializing in mold cases . . . .'

Again, a hearing or trial was not scheduled for July 15, 2003.

"7. Then, on July 17, 2003, Ms. Pieracci and Ms. Bohlig [Hillbrant's clients] wrote to Mr. Miller. The letter is formatted just as the Respondent's letters were formatted. This letter contains the following odd language:

'I am disappointed that we will have to go to court to avoid going to jail because of bills and hardship your company has caused. I thought you were a more decent human being than this. The angels said in meditation that

they were encouraging you to settle with us to help us after what your company has done to us. And now we will have to go to court. We will get awarded much more money than what is fair and just to your company, which is often done in these cases when you treat people inhumanely.

'You will be receiving the letter from Dr. Jason Reed on Monday, because he was out of town until then. By then it will be too late because we will already be in court.

'We can play dirty too, like you are trying to do. But we won't. Our morals wouldn't allow it.

'I would like to appeal to you as a human being who happened to buy a faulty product from you and was continuously put off by underlings to the point of financially ruining us and making us incredibly ill. But you are not humane are you? Or you would settle with us like the angels said. To [sic] bad you are going to ruin your nice company and be the cause of its downfall. The angels told us this would happen if you did not listen to them in meditation and be a source of light for all people.'

### "Restraining Order

"8. Because of the Respondent's repeated contact with the construction companies, on August 12, 2003, the Lennar Corporation filed a petition for a temporary restraining order against the Respondent. In the petition, the Lennar Corporation made the following allegations:

'On or about May 13, 2003, Lennar President and Chief Executive Officer Stuart Miller started to receive phone calls and letters from a person who identified herself as Diane Hillbrant, and who purported to be an attorney in Waconia, Minnesota. Hillbrant, in a letter dated July 12, 2003, and addressed to Miller and the Board of Directors of Lennar, stated that she was initiating a class action lawsuit against Lennar and included in the letter a list of 43 homeowners who were purported to be clients of Hillbrant and whom Hillbrant contended were forming a class action suit against Lennar.

'Hillbrant also stated in the letter that she had scheduled a hearing before the Environmental Protection Agency, to be conducted on December 15, 2003, at 9:00 a.m. Hillbrant stated generally that this claimed class action would be based on vaguely-described alleged problems with the construction of certain Lundgren and Orrin Thompson homes. On further investigation, Lennar found that virtually all of the persons listed as class action plaintiffs, including the mayor of Plymouth, Minnesota, had never heard of Hillbrant and had no such claims.

'Lennar promptly referred the matter to the Leonard, Street and Deinard law firm ("Leonard, Street"). At that time, Lennar clearly and unambiguously instructed Hillbrant to not contact Lennar executives or employees further, and to direct any further communications to Leonard, Street. By letter on July 18, 2003, Leonard, Street instructed Hillbrant to have no

further contact with Lennar executives and to correspond only with the law firm. The letter reminded Hillbrant, who purported to be an attorney, of her ethical obligations under Rule 4.2 of the Minnesota Rules of Professional Conduct, to not contact directly a represented party.

'Despite this letter and numerous verbal and written instructions to Hillbrant, she continued to contact Lennar senior executives either directly, through unsigned correspondence, or through letters signed by her clients themselves, presumably at Hillbrant's direction. Since July 13, executives at Lennar have continued to receive a stream of facsimiles and telephone contacts from Hillbrant or people in concert with Hillbrant, all making demands for money and making inflammatory allegations about Lennar, its executives and the Lundgren homes that are apparently the subject of Hillbrant's claims. Additionally, Hillbrant has in the past week commenced contacting Lennar board members directly, including board member and former cabinet secretary Donna Shalala, making similar demands for money. Despite repeated efforts to deter these contacts, and despite the ethical obligations of attorneys to not contact represented parties directly, Hillbrant and those in concert with her continue to harass senior executives and board members at Lennar in this fashion. When Lennar's designated attorneys attempt to speak to Hillbrant on the telephone, she hangs up the telephone.

'On many occasions Hillbrant has demanded that Lennar pay her $50,000 or $100,000 immediately that day, "by the close of business," or she threatens to sue Lennar. Other communications indicate that "the angels said in meditation that they were encouraging you to settle with us." Her contacts have been abusive, threatening and increasingly hostile.'

Thereafter, on August 12, 2003, the Court granted Lennar's petition for a temporary restraining order, finding that the Respondent had 'engaged in repeated incidents of intrusive and unwanted acts and words.'

"9. On August 19, 2003, Lennar filed a petition for an order to show cause. In the Petition, Lennar asserted that the Respondent repeatedly attempted to evade service of the temporary restraining order and that she continued to harass employees, executives, and board members of Lennar.

"10. The Respondent responded to Lennar's petition for an order to show cause by filing four documents, a 'Request to Drop Temporary Restraining Order and Comtemp [*sic*] of Court Motions,' a 'Complaint,' a 'Requital,' and an unnamed document.

"11. In the unnamed document, filed on September 16, 2003, the Respondent made unusual claims, including:

'3) This restraining order is just another act of oppression and stalling that this giant corporation is using against my client to prevent justice from happening. The CEO, Stuart Miller, has stated to me in front of witnesses that, "I have a large corporation and more money than you have and therefore I will bankrupt you in attorneys fees before you can ever take this to

court." He also said, "If you do get it to court you will be dead before you see a dime."

. . . .

'35) I was served with a second set of papers for Contempt of Court by the Lennar Corporation because they falsely claimed that I had violated the first order. I did not violate the first order, and did not contact the Lennar Corporation; yet they served me with this second set of papers, claiming that I had:

a) I did not contact Lennar after the first set of papers and I did not direct anyone to do so. I have witnesses from the Plaintiffs that this is so, that proves my innocence.

b) This is purely a defensive tactic to keep me from contacting the Board of Directors of Lennar Corp. that functions as a legal restraining arm of the CEO and its company and acts on behalf of the public and its shareholders, of which I am one.

c) Therefore, I have every legal right to contact the Board of Directors, that is a public arm of checks and balances to keep the company in line, including the CEO.

'36) Lennar's CEO Stuart Miller, panicked when the truth began to be given to their Board of Directors about my clients['] catastrophic financial losses, and the risk to their health, their livelihood and the well being of their families.

'37) I am involved in the legality of Board's [sic] of Directors because I have served on them for years. I know the legal responsibilities of Board Members.

a) I know it is illegal to prevent an attorney from trying to contact a Board member or a CEO for a part of [sic] case that is building against them and to press for settlement.

'38) This whole action is a farce that needs to be removed because it is misusing the justice system for evil intent.

. . . .

'43) Further, your Honor, we are charging the Lennar Corporation, and Stuart Miller in particular, the CEO of that corporation, with Infamy of the Judicial System of the United States. They are trying to make a farce out of it to protect their criminal actions.

a) They almost killed an employee of Beverly Pieracci's who had to work long hours. They also almost killed several other employees including Beverly Pieracci herself.

b) They forced them into mold inhalation through lack of response and criminal negligence.

c) They have forced them to live in a motel, promising to pay the bill, which they have not done.

d) They have forced, Beverly Pieracci, my client, into criminal charges; forcing her to defend herself to avoid jail sentences; and forcing

her and her employees to long careers with their physicians due to coughing up blood, internal bleeding, wheezing, pneumonia, bronchitis, mononucleosis, sucking on inhalers and various assorted infamies.'
The Respondent's statements in this document establish that the Respondent failed to provide 'competent' representation.

"12. Although the Respondent was the 'Respondent' in the restraining order case, the Respondent filed a Summons and Complaint.

## "Suit Filed in Behalf of Beverly Pieracci against Lennar Corporation

"13. On September 9, 2003, the Respondent filed suit in behalf of Beverly Pieracci against Lennar Corporation in the District Court of Hennepin County, Minnesota, case number 03-15428. In the complaint, the Respondent requested $3 million in 'emergency restitution.' Also on September 9, 2003, the Respondent filed 'pro hac vice affidavit.' However, the affidavit was deficient.

"14. The complaint filed by the Respondent was deficient and contains bizarre statements. The complaint provided, in part, as follows:

'II

'From the first date of purchase the Plaintiff's home has been leaking due to faulty construction with improper venting problems. The Defendants have refused to respnd [sic] or act in accordance with the contractual agreement with the Plaintiff, specifically honoring their 10-year warranty for the home. Because of the failure of the Defendant's [sic] to act and their willful and wantom [sic] negligence, they performed attempted manslaughter by refusing to fix or refund the Plaintiff's new home, causing people to stay in it even when it made them ill.

'III

'These willful and wantom [sic] acts of criminal negligence have culminated in a person almost dying twice in the ambulance and ICU from mold inhalation. . . .

'IV

'The Defendants further have robbed the Plaintiff of her financial good credit standing by forcing her to live in a motel and operate her business out of a motel, refusing to fix the dangerous building they built. The Defendant has robbed people of their rights and their lives, not just their money.

. . . .
'WHEREFORE, Plaintiff Beverly Pieracci prays for an Emergency Hearing and a Judgement [sic] and Emergency Restitution of the Court as follows:

'1. For an emergency Hearing of the Court within three (3) days allowing for emergency restitution of $3 million, to be granted to the Plaintiff who is bankrupted and threatened with a judgement [sic] of fraud with an impending

prison sentence because of breach of contract and crimes of infamy committed by the Defendant against the Plaintiff.'

"15. Two days after filing suit, on September 11, 2003, the Respondent filed a document titled, 'Inter-Jurisdiction.' It appears to be a letter from the Respondent to three District Court judges. In the document, she repeated many of the odd statements made in other pleadings. Additionally, she stated for the first time that Ms. Pieracci was seeking $5 billion in damages, in addition to the $3 million in 'emergency restitution.'

"16. Then, on September 16, 2003, the Respondent filed another document titled, 'Complaint.' In this complaint, the Respondent requests that a judge recuse herself. By issuing a Summons to Judge Kaman, the Respondent attempted to make the judge a party to the action and demanded that the judge answer within one day.

"17. Although the Respondent's request to be admitted *pro hac vice* had not been ruled on, the Respondent filled out the Certificate of Representation as the lawyer for Ms. Pieracci. The Respondent signed the Summons and Complaint, but had not included an attorney registration number. Furthermore, the documents filed by the Respondent were not countersigned by an attorney licensed to practice law in Minnesota as required by Minnesota General Rule of Practice 5. Finally, in the document titled, 'Inter-Jurisdiction,' the Respondent proclaimed that she was '[w]orking in the State of Minnesota under Ad [*sic*] Hac Vice.'

*"Criminal Convictions*

"18. In April, 2004, the Carver County, Minnesota, District Attorney charged the Respondent with six counts of unauthorized practice of law in violation of Minn. Stat. § 481.02, subd. 1 (2002). In February, 2005, a jury convicted the Respondent of five counts of unauthorized practice of law. The sixth count was dismissed by the state. The Respondent filed a motion for new trial, which the Court denied. In April, 2005, the Court sentenced the Respondent to 90 days in jail on each count, to be served consecutively, and a $1,000 fine on each count. The Court stayed the execution of the sentence for one year. The Court ordered that the Respondent pay restitution in the total amount of $19,698.45. The Respondent's conviction and the order of restitution were upheld on appeal."

## HEARING PANEL CONCLUSIONS OF LAW

The hearing panel then made the following conclusions of law:

"1. Based upon the Respondent's stipulations and the above findings of fact, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 1.1, KRPC 4.1, KRPC 4.2, KRPC 4.4, KRPC 5.5, and KRPC 8.4(c), as detailed below.

"2. Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' The Respondent is a

Kansas attorney. She engaged in the practice of law, albeit the unauthorized practice of law. And in so doing, the Respondent failed to competently represent her clients. The pleadings she filed were ineffective and did not advance her client's cause. In making this conclusion, however, the Hearing Panel by no means is stating that the unauthorized practice of law is appropriate if the representation is competent. The Hearing Panel finds that the lack of Respondent's competency demonstrates the salutary purpose of requiring authorization to practice law. Accordingly, the Hearing Panel concludes that when the Respondent engaged in the unauthorized practice of law her performance was incompetent and, as a result, the Respondent violated KRPC 1.1.

"3. KRPC 4.1(a) provides that '[i]n the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person.' The Respondent violated KRPC 4.1(a) when she knowingly, intentionally, and repeatedly included false information in her written correspondence. As such, the Hearing Panel concludes that the Respondent violated KRPC 4.1(a).

"4. In order to communicate with a person known to be represented by counsel in a matter, a lawyer must first obtain the consent of the other lawyer. See KRPC 4.2. In this case, the Respondent repeatedly contacted represented persons without first obtaining the consent of their counsel. The Hearing Panel, therefore, concludes that the Respondent violated KRPC 4.2.

"5. KRPC 4.4 provides:

> 'In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.'

When the Respondent repeatedly contacted Mr. Miller, Mr. Fischer, and Mr. Woodward, she had no valid substantial legal purpose, other than to embarrass, delay, or burden third persons. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 4.4.

"6. KRPC 5.5(a) prohibits the unauthorized practice of law. The Respondent represented Ms. Pieracci, Ms. Bohlig, and others in Minnesota. The Minnesota Supreme Court never licensed the Respondent to practice in its state. Further, the Court in Minnesota denied the Respondent's request to be admitted *pro hac vice*. The Hearing Panel, therefore, concludes that the Respondent violated KRPC 5.5(a).

"7. 'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The Respondent engaged in conduct that involved dishonesty when she repeatedly included false information in her written correspondence to Mr. Miller, Mr. Fischer, and Mr. Woodward. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c).

## "AMERICAN BAR ASSOCIATION
## STANDARDS FOR IMPOSING LAWYER SANCTIONS

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated her duty to the legal profession to refrain from the unauthorized practice of law and her duty to the public to maintain her personal integrity.

"*Mental State.* The Respondent knowingly and intentionally violated her duties.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused actual harm to the construction companies and to the reputation of the legal profession.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"Prior Disciplinary Offenses. The Respondent was suspended for a period of one month by the Supreme Court of Illinois for the misconduct in this case. So, while it is technically not a prior disciplinary offense, it is important to note that action was taken on her license to practice law in the State of Illinois.

"Dishonest or Selfish Motive. The Respondent's misconduct was motivated by dishonesty. The Respondent repeatedly made false statements in written correspondence.

"A Pattern of Misconduct. The Respondent repeatedly engaged in the same misconduct. Thus, the Hearing Panel concludes that the Respondent engaged in a pattern of misconduct.

"Multiple Offenses. The Respondent violated KRPC 1.1, KRPC 4.1, KRPC 4.2, KRPC 4.4, KRPC 5.5, and KRPC 8.4(c). As such, the Respondent committed multiple offenses.

"Illegal Conduct, Including that Involving the Use of Controlled Substances. The Respondent engaged in illegal conduct when she practiced law in the State of Minnesota without a license. As a result of her actions, the Respondent was convicted of five misdemeanor charges of engaging in the unauthorized practice of law.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"Absence of a Prior Disciplinary Record. The Respondent has not previously been disciplined for any other misconduct.

"The Present Attitude of the Respondent as Shown by her Cooperation During the Hearing and the Respondent's Acknowledgment of the Transgressions. The Respondent fully acknowledged her misconduct at the hearing on this matter.

"Inexperience in the Practice of Law. The Kansas Supreme Court admitted the Respondent to practice law in 1984. However, the Respondent has never engaged in the practice of law [in Kansas]. Other than the misconduct at hand, the Respondent has not practiced law.

"Imposition of Other Penalties or Sanctions. The Respondent was convicted of five misdemeanor charges of engaging in the unauthorized practice of law. The [Minnesota] Court sentenced the Respondent to a term of incarceration and a fine. However, the Court suspended the imposition of the sentence. The Court ordered that the Respondent pay nearly $20,000 in restitution. As of the time of the hearing, the Respondent indicated that she had paid approximately $14,000 toward the restitution.

"Remorse. At the hearing on the Formal Complaint, the Respondent expressed genuine remorse.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'Suspension is generally appropriate when a lawyer engages in an area of practice in which the lawyer knows he or she is not competent, and causes injury or potential injury to a client. Standard 4.52.'

'Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding. Standard 6.12.'

'Suspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding. Standard 6.22.'

'Suspension is generally appropriate when a lawyer engages in communication with an individual in the legal system when the lawyer knows that such communication is improper, and causes injury or potential injury to a party or causes interference or potential interference with the outcome of the legal proceeding. Standard 6.32.' "

## HEARING PANEL RECOMMENDATION

The panel recommended the following discipline:

"The Deputy Disciplinary Administrator recommended that the Respondent be indefinitely suspended. The Respondent joined in the Disciplinary Administrator's recommendation for indefinite suspension. The Respondent joined in the recommendation, in the hopes of avoiding disbarment. The Respondent feared that if she was disbarred it might affect her pharmacy license.

"As mentioned above, the Illinois Supreme Court suspended the Respondent's license for one month. Given the nature of the Respondent's misconduct, and particularly the fact that the Respondent engaged in dishonest conduct, it appears that a much more significant sanction than that in Illinois should be imposed. Based upon the findings of fact, conclusions of law, the Standards listed above, and the joint recommendation of the parties, the Hearing Panel unanimously recommends that the Respondent be indefinitely suspended from the practice of law in the state of Kansas."

## DISCUSSION

In a disciplinary proceeding, we consider the evidence, the findings of the disciplinary panel, and the arguments of the parties to determine whether the respondent violated the KRPC and what discipline should be imposed. Attorney misconduct must be established by substantial, clear, convincing, and satisfactory evidence. *In re Landrith*, 280 Kan. 619, 636, 124 P.3d 467 (2005); Supreme Court Rule 211(f) (2007 Kan. Ct. R. Annot. 304) (misconduct to be established by clear and convincing evidence).

The respondent does not contest the hearing panel's findings, conclusions, or recommendation. This court has considered the final hearing report of the panel, the record on appeal, and the respondent's remorseful statements at oral argument before the court and adopts the findings of fact, conclusions of law, and the recommendations of the panel. The findings and conclusions established by clear and convincing evidence that the respondent violated KRPC 1.1, KRPC 4.1, KRPC 4.2, KRPC 4.4, KRPC 5.5, and KRPC 8.4(c).

IT IS THEREFORE ORDERED that the respondent, Diane L. Hillbrant, be and she is hereby disciplined by indefinite suspension from the practice of law in the state of Kansas in accordance with Supreme Court Rule 203(a)(2) (2007 Kan. Ct. R. Annot. 261) for violations of KRPC 1.1, KRPC 4.1, KRPC 4.2, KRPC 4.4, KRPC 5.5, and KRPC 8.4(c).

IT IS FURTHER ORDERED that this opinion be published in the official Kansas Reports and that the costs of these proceedings be assessed to the respondent.